

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-19-1994

# Gov't of the Virgin Islands v. Robinson

Precedential or Non-Precedential:

Docket 93-7675

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Gov't of the Virgin Islands v. Robinson" (1994). *1994 Decisions.* Paper 85.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/85

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NO. 93-7675


GOVERNMENT OF THE VIRGIN ISLANDS

v.

ROBINSON, JACKSON, a/k/a
HUGHES, LAUREN LEWELL


Jackson Robinson,
Appellant


On Appeal From the District Court of the Virgin Islands
Division of St. Thomas and St. John
(D.C. Crim. Action No. 93-00066)


Argued April 21, 1994

BEFORE:  STAPLETON, ALITO and WEIS, Circuit Judges

(Opinion Filed July 19, 1994)




Thurston T. McKelvin
Federal Public Defender
Stephen A. Brusch (Argued)
Asst. Federal Public Defender
P. O. Box 1327
Charlotte Amalie, St. Thomas
U.S. Virgin Islands  00804-1327
Attorneys for Appellant

Hugh P. Mabe, III
U.S. Attorney
James A. Hurd (Argued)
1st Asst. U.S. Attorney
U.S. Courthouse
5500 Veterans Drive, Suite 260
Charlotte Amalie, St. Thomas
U.S. Virgin Islands  00802-6924
Attorneys for Appellee

OPINION OF THE COURT

STAPLETON, <u>Circuit Judge</u>:

Jackson Robinson killed Stedley Joseph on March 10, 1993 with a two-by-four he picked up while they were fighting. Robinson was tried in the District Court of the Virgin Islands for first degree murder. The jury convicted Robinson of the lesser included offense of voluntary manslaughter. On appeal, Robinson argues that the district court erroneously refused to instruct the jury regarding the defenses of self-defense and excusable homicide. Upon reviewing the evidence presented at trial, we believe the district court should have instructed the jury regarding the self-defense defense. We do not think the district court erred, however, in refusing to instruct the jury regarding excusable homicide.

I.

Robinson lived with his girlfriend Christabelle Joseph. Christabelle was married to Stedley Joseph, the homicide victim, but had been separated from him for two years and had filed for divorce. Robinson and Christabelle had a newborn baby daughter named Talicia. Robinson and Christabelle jointly cared for and financially supported Talicia as well as three older children of Christabelle's whom Stedley had fathered. Stedley did not contribute to the care or support of his three children.

The unrebutted defense testimony established that Stedley had a reputation for being violent and dangerous, and that Robinson was aware of Stedley's reputation.  Before Christabelle and Stedley separated, Stedley had beaten Christabelle.  A 1990 domestic violence complaint Christabelle filed against Stedley was entered into evidence, as was a 1991 restraining order against Stedley by the Territorial Court of the Virgin Islands.  The 1991 restraining order prohibited Stedley "from having any further contact with [Christabelle] and from going to or entering [Christabelle's] residence," and also enjoined Stedley from "harassing, molesting, abusing, assaulting, contacting or intimidating [Christabelle], or subjecting her to any form of violence, including but not limited to assault and battery."  App. at 180-81.

The unrebutted testimony of Robinson, Christabelle, and one of their neighbors also established that after Christabelle became pregnant with Robinson's child, Stedley came continually to the yard outside Robinson's and Christabelle's residence and verbally harassed and threatened them.  Stedley would try to incite Robinson to argue or fight with him, but Robinson ignored him.  Stedley threatened to kill Robinson.  Robinson stopped walking the street at night because he feared Stedley.  According to Robinson: "Christabelle's mother and father tell me to stay away from the man, because if he met me at night, he can do anything."  App. at 136.  The latest Robinson would travel outside was 7:00 p.m., and only on days when he performed Christabelle's part-time job cleaning a dentist's office.

Christabelle had experienced birth-related health complications, and, while she was recovering, Robinson performed her job after finishing his own day job as a construction worker.

On Monday March 8, 1993, fifteen days after Christabelle had given birth to Talicia, Stedley came to Christabelle's and Robinson's residence while Robinson was not home, and told Christabelle that he was going to kill her when he met her on the road. Christabelle believed that Stedley would try to carry out his threat. When Robinson came home, she and Robinson went to the local police station, and filed a complaint against Stedley.

Two days later, on Wednesday March 10, at 5:30 p.m., after Robinson completed his construction job, he set out to do Christabelle's job at the dentist's office. Robinson took Christabelle's and Stedley's seven-year-old daughter, Elaine, with him. As Robinson and Elaine were walking, they met Stedley, whom Robinson described as a much larger man than he. Robinson testified that the following events then occurred.

Stedley spoke to his daughter Elaine, and told her to come with him to Robinson's and Christabelle's residence. Robinson told Stedley to leave Christabelle alone. Stedley then said "I'm not in your place" and pushed Robinson with two hands on Robinson's chest. Robinson understood Stedley's statement "I'm not in your place" to mean that Stedley "was not at my yard where he normally comes to make trouble." App. at 133.

Robinson moved back, but Stedley followed and pushed him again the same way. Stedley put his hand near Robinson's

face, and Robinson was afraid that Robinson was going to "chock in my eye."  Robinson said "Don't jack [push] me," and grasped Stedley's hand, "guiding" it "so he wouldn't chock in my face."  Robinson then turned to get away from Stedley, and Stedley "grabbed" at him and "burst my watch off my hand."  App. at 134.

Robinson stooped to pick up his watch, and while he was standing back up, Stedley "jack[ed] [Robinson] again with his left hand in [Robinson's] chest," causing Robinson to stumble.

Id.  According to Robinson:

> Where I was stumbling to fall, there was a piece of stick.  I took the stick, swing it at the man to keep him off.
>
> He didn't stop.  He keep coming.  This time he dive to grab me on my waist.  When I swing again it hit him somewhere on his head, on his shoulder, and he went down.  That was it.
>
> . . . .
>
> When I see the man fall, I drop the wood.  He didn't move.  I drop the wood.  A police officer run down -- I was walking away.  The police officer tell me he is a cop, lean up against a van.
>
> . . . .
>
> I only hit Mr. Joseph twice.  He block it once.  I swing at him and he block.  Mr. Joseph figure he couldn't get on top of me from blocking, so he dive to grab in my waist, when I swing that way, and he come down low, and the wood hit him on his head and shoulder.

App. at 134-36.[1]

---

[1]Robinson's trial testimony was consistent with a sworn statement he dictated to an investigating police officer, Roy Moorehead, on the night of the fight, and which Moorehead read aloud at trial.

Robinson's testimony that Stedley was the only one doing any pushing, and Robinson's testimony that he hit Stedley twice and then, after Stedley fell, that he dropped the two-by-four and walked away, was contradicted by two government witnesses. Reginald Francis testified that he saw the fight from a distance of fifty-yards at a bar where he was having a cocktail. Francis testified that he saw the two men pushing one another. Francis also testified that after Robinson hit Stedley twice and Stedley fell to the ground, Robinson stood over the prone Stedley, hit him three more times in the head, and then ran away. Francis, a health inspector and an auxiliary police officer, then ran after Robinson and arrested him.

Lisa Babb, a high-school student who had been walking to "fraternity stepping practice" also saw the fight. According to Babb, both men had "pushed off each other." App. at 93. Babb also testified that Robinson hit Stedley with the two-by-four three times while Stedley was standing -- "really hard" the third time on the back of Stedley's head. Stedley then fell and "hit on the concrete." After falling, Stedley "didn't move at all. . . . He couldn't move," but Robinson hit him two or three times more around the neck and shoulder area. Robinson then "threw the stick and . . . ran." App. at 88-89.

After the fight, Stedley was taken to St. Thomas Hospital where he remained unconscious due to brain swelling. The

Moorehead testified that the sworn statement Robinson dictated to him also was consistent with an account Robinson had given Moorehead during an earlier discussion.

attending neurologist testified that it appeared that Stedley had been struck at least once in the head and once in the shoulder. "It is possible that he may have been struck more than once" either on the head or the shoulder, the neurologist testified, "but I would not be able to tell that." Stedley also was bleeding from his nose and left ear, and had a "big scratch or small cut, depending on how you want to look at it" on his left leg. After three days, the neurologist determined that Stedley was brain dead. With permission from Christabelle, the neurologist tapered off Stedley's medication. After twenty-four days, Stedley's heart stopped, and he was pronounced dead. According to the neurologist, "[t]he blow to the head is what caused him to die." App. at 39-42.

At Robinson's trial, the district court instructed the jury that if it found that Robinson was not guilty of first degree murder, it might still find him guilty of either of the lesser-included offenses of second-degree murder or voluntary manslaughter.[2] Robinson had requested that the district court

---

[2]Virgin Islands law defines murder as "the unlawful killing of a human being with malice aforethought." V.I. Code Ann. tit. 14, § 921 (1964). First degree murder is

>    All murder which--
>
>    (1) is perpetrated by means of poison, lying in wait, torture or by any other kind of willful, deliberate and premeditated killing; or
>
>    (2) is committed in the perpetration or attempt to perpetrate arson, burglary, kidnapping, rape, robbery or mayhem . . . .

instruct the jury regarding self-defense and excusable homicide, but the district court did not give either of these instructions to the jury. We have not found in the record an indication of the district court's reasons for refusing to give the self-defense instruction; it also appears that Robinson's request for the instruction was not opposed by the prosecution at trial. We think it likely that the district court refused to give the excusable-homicide instruction because it believed a two-by-four, as used by Robinson, was a "dangerous weapon" within the meaning of the excusable-homicide statute and that this precluded that statute's application.

## II.

A defendant "is entitled to [a jury] instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Matthews v. United States, 485 U.S. 58, 63 (1988). The government agrees with this proposition, but contends that Robinson failed to present evidence sufficient to justify either a self-defense or excusable-homicide instruction under the laws of the Virgin Islands.

## A.

Virgin Islands law specifies that killing in self-defense is lawful and justifiable homicide, and that self-defense

---

Id. § 922(a). Second degree murder is "All other kinds of murder." Id. § 922(b) (1964). Voluntary manslaughter is the "unlawful killing of a human being without malice aforethought . . . upon a sudden quarrel or heat of passion." Id. § 924 (1964).

is a statutory right.  Government of the Virgin Islands v. Smith,

949 F.2d 677, 680 (3d Cir. 1991); V.I. Code Ann. tit. 14,

§§927(2)(C), 928, 43 (1964).  According to V.I. Code Ann. tit.

14, § 927:

> Homicide is justifiable when committed by--
>
> . . . .
>
> > (2) any person--
>
> . . . .
>
> > (C) when committed in the lawful
> > defense of such person, . . . when there is
> > reasonable ground to apprehend a design to
> > commit a felony, or to do some great bodily
> > injury, and imminent danger of such design
> > being accomplished; but such person, . . . if
> > he was . . . engaged in mortal combat, must
> > really and in good faith have endeavored to
> > decline any further struggle before the
> > homicide was committed.

Whether or not a defendant acted in self-defense hinges on the

defendant's subjective beliefs and the objective reasonableness

of these beliefs.  Smith, 949 F.2d at 684.

> If the defendant had a reasonable ground to
> believe and actually did believe that he was
> in imminent danger of death or serious bodily
> harm, and that deadly force was necessary to
> repel such danger, he would be justified in
> using deadly force in self defense, even
> though it may afterwards have turned out that
> the appearances were false.

Id. at 684-85.  The right of self-defense, however, "does not

extend to the infliction of more harm than is necessary for the

purpose of defense."  V.I. Code Ann. tit. 14, § 43 (1964).

Thus, self-defense is a recognized defense under Virgin

Islands law, and the court may not refuse a defendant's request

for a self-defense instruction when the evidence reveals a basis for the defense. Smith, 949 F.2d at 681 (citing Government of the Virgin Islands v. Salem, 456 F.2d 674 (3d Cir. 1972)); see also Smith at 684 ("[W]e believe that a fair reading of the evidence reveals a plausible case for self-defense which, combined with the possibility that the jury misallocated the burden of proof [on the self-defense issue], requires that Smith be accorded a new trial.").[3]

In Robinson's case, we think the record contained evidence from which a reasonable jury could find that Robinson acted in self-defense when he killed Stedley. Stedley had a reputation for violence of which Robinson was aware. Stedley had beaten Christabelle at least twice. Apparently angered by Christabelle's pregnancy, he had continually come to Robinson's residence, and harassed and threatened Robinson and his family, even threatening to kill Robinson. Robinson refrained from walking the streets at night for fear of Stedley. Two days earlier, two weeks after Christabelle had given birth, Stedley had threatened to kill Christabelle if he met her "on the road."

When Robinson met Stedley on the road, Stedley pushed Robinson and told him "we are not at your place." In context, Stedley's statement could reasonably be taken to imply that at that moment Stedley felt less restrained about acting violently

---

[3]As with other affirmative defenses in criminal cases, under Virgin Islands law, once a defendant introduces evidence from which the jury could find the elements of self-defense, the prosecution has the burden of proving its absence beyond a reasonable doubt. Smith, 949 F.2d at 680.

than when he usually spoke to Robinson at Robinson's residence. Robinson backed away, but Stedley pushed him again. Stedley put his hand near Robinson's face in such a manner that Robinson feared Stedley would "chock" him in his eye. Robinson tried to get away from Stedley but Stedley grabbed him in such a manner that Robinson's watch "burst" off his wrist. While Robinson was picking up his watch, Stedley pushed him again, causing him to stumble and fall. Robinson picked up a two-by-four near where he fell and swung it at Stedley to keep him away. Stedley blocked the two-by-four and kept coming. He dove at Robinson's waist, and Robinson swung the two-by-four again, this time striking a fatal blow.

If the jury believed Robinson's story, as it was entitled to do, it reasonably could find that when Robinson delivered the fatal "second-and-final blow" with the two-by-four, he believed the blow was necessary to prevent Stedley from causing him great bodily harm. It could also conclude that Robinson's belief was reasonable under the circumstances.

The government offers three arguments why a self-defense instruction would not have been appropriate.[4] First, the

---

[4]The government also cites four opinions upholding murder convictions in trial courts that had refused to give self-defense instructions. None of the cases is remotely comparable to this one.

Whipple v. Duckworth, 957 F.2d 418 (7th Cir. 1992), cert. denied, 113 S. Ct. 218 (1992), involved a juvenile who killed his parents. Although the juvenile had suffered a lifetime of daily abuse at his parents' hands, he did not claim to have been in immediate danger when he killed them.

government argues that the testimony of Francis and Babb tended to rebut Robinson's assertion that Stedley was the initial aggressor, and also that Francis and Babb testified that Robinson continued to strike Stedley with deadly force even after Stedley no longer posed an imminent threat.  We think the government is correct that if things happened the way Francis and Babb said they happened, a reasonable jury could not find that Robinson killed Stedley in self-defense.  But, whether things happened the way Robinson said they did, or the way Francis and Babb said they did, was for a properly instructed jury to decide.

In Government of the Virgin Islands v. Salem, 456 F.2d 674 (3d Cir. 1972), Salem was tried and convicted for criminal assault and battery for shooting and wounding two people.  Salem requested a jury instruction based on the Virgin Islands Code provisions on self-defense and lawful violence, but the district

---

In United States v. Garcia, 625 F.2d 162 (7th Cir. 1980), cert. denied, 449 U.S. 923 (1980), the three defendants testified that the victim started a fight with them.  However, as their testimony is recounted in the Court of Appeals' opinion, the defendants apparently did not dispute eyewitness accounts and medical evidence that after the initiation of the altercation, the defendants chased the victim down a hallway, caught him, held him down, and stabbed him forty-seven times.  625 F.2d at 165, 169.

In United States v. Crowder, 543 F.2d 312 (D.C. Cir. 1976), cert. denied, 429 U.S. 1062 (1977), the defendant did not testify that he shot the victim in self-defense; rather, he denied shooting the victim at all.

United States v. Wagner, 834 F.2d 1474 (9th Cir. 1987), denial of post-conviction relief aff'd, 5 F.3d 544 (9th Cir. 1993), cert. denied, 114 S. Ct. 1110 (1994), involved a defendant who had "steadfastly" claimed that his killing of a fellow prison inmate was an accident that occurred while the defendant was unlawfully resisting a prison guard.  834 F.2d at 1486-87.

court refused his request.  At trial, Salem had presented an "amorphous defense."  456 F.2d at 675.  Nonetheless, we were "persuaded that if the jury accepted [Salem's] testimony, the self-defense and lawful violence provisions of the Code would have been relevant."  Id.

> Although other witnesses contradicted [Salem's] version of the shooting, [Salem's] credibility nevertheless was for the jury, United States v. Barber, 442 F.2d 517, 522 (3d Cir. 1971), and there being a basis in his testimony for the application of the self-defense doctrine, the instructions should have been submitted as requested. Under such circumstances, "it is not the province of the court to accept or reject testimony tending to establish self-defense," United States ex rel. Crosby v. Brierly, 404 F.2d 790, 801 (3d Cir. 1968).

Id.

The government's second argument is that even if Robinson's account is assumed to be true, his account could not convince a reasonable jury that he actually believed he was in imminent danger of serious bodily harm.  The government belittles the seriousness of Stedley's behavior, stating that Stedley's pushing Robinson, grabbing his arm, and trying to tackle him were "hardly life-threatening actions."  V.I. Br. at 10.  The government, however, ignores the context of Stedley's actions. Specifically, it ignores: (1) that Stedley had a reputation for violence and had previously beaten Robinson's girlfriend, (2) that Stedley had previously threatened to kill Robinson, (3) that Robinson would not go out at night for fear of meeting Stedley, (4) that two days earlier Stedley had threatened to kill Robinson's girlfriend if he met her "on the road," (5) that

Robinson and his girlfriend had taken the threat seriously and had reported it to the police, and (6) that Robinson had just met Stedley "on the road" and that Stedley had threateningly reminded him that they "were not at Robinson's place."

The government also contends that a self-defense instruction would have been inappropriate because "[a]t no time . . . did [Robinson] ever indicate that he was in fear of death or serious bodily injury during the incident." V.I. Br. at 10 (emphasis in original). We disagree. According to the trial transcript, Robinson testified that he was afraid that Stedley was going to "chock" him in the eye. While he did not explain specifically what he meant by "chock,"[5] we think a reasonable jury could conclude from the context that Robinson feared being gouged in the eyes with sufficient force to cause them substantial injury.

More importantly, we cannot agree with the government that an instruction on self-defense should be given only where the defendant expressly states on the witness stand that he possessed a fear of serious bodily injury. We think Robinson's testimony that Stedley had threatened to kill him, that Robinson took the threat seriously enough to stop walking the streets at night, that Stedley was much larger than Robinson, and that Stedley had suddenly come upon Robinson, pushed him, prevented

---

[5]A glossary of Virgin Islands dialect states that the verb "chock," pronounced choke, means "to puncture, jab, pierce, prod, or prick" or "to receive an injection." Lito Valls, What a Pistarckle!: A Glossary of Virgin Islands English Creole (1st ed. 1981).

his withdrawal and was lunging in an effort to tackle him, provides a sufficient basis for a jury to find that Robinson was in fear of serious bodily injury during the attack.

Third, the government argues that even assuming Robinson's account were true, and even assuming Robinson feared serious injury, Robinson's use of the two-by-four when both men were unarmed was "unreasonable and excessive and invalidated his self defense claim under Virgin Islands law." V.I. Br. at 10, citing Government of the Virgin Islands v. Frett, 14 V.I. 315 (1978). The government is correct that under Virgin Islands law no more force may be used in self-defense than is reasonably necessary to repel imminent danger. However, as the case cited by the government correctly states, "[w]hether the force used . . . is excessive is a question of fact and depends upon the circumstances of each case." Frett, 14 V.I. at 323. We think a reasonable jury could find that Robinson's use of the two-by-four was reasonably necessary under the circumstances.

Robinson testified that he backed away from the much larger Stedley but that Stedley kept coming. When Stedley pushed Robinson and Robinson fell, the two-by-four was the only means at hand by which Robinson could keep Stedley away. After Robinson swung the two-by-four at Stedley the first time, Stedley blocked it and tried to tackle Robinson. A reasonable jury might well think that the failure of Robinson's first blow to deter

Stedley's continuing advance demonstrated the necessity of his

second, apparently fatal, blow.[6]

B.

---

[6]We do not understand the government to urge that use of a deadly
weapon against an unarmed assailant necessarily precludes a self-
defense instruction.  Since serious bodily injury and even death
can be inflicted by an unarmed assailant, the law of self-defense
recognizes that use of a deadly weapon to deter such an assailant
is justified where there is a reasonable fear of such injury.  As
the court put it in People v. Estes, 469 N.E.2d 275 (Ill. App.
Ct. 1984):

> [T]he law does not require that the aggressor
>
> be armed in order that the use of a deadly
>
> weapon in self-defense be justified.  Where
>
> it is clear that the aggressor is capable of
>
> inflicting serious bodily harm on the
>
> defendant without the use of a deadly weapon,
>
> and it appears that he intends to, then it is
>
> not necessary that the aggressor be armed for
>
> the defendant to employ deadly force in self-
>
> defense. . . .
>
>      . . . .
>
>      . . . When one is threatened by a person
> who carried out his threats on a previous
> occasion, he does not have much time to
> reason out his response or judge precisely
> how much force is necessary to repel the
> threatened attack.  . . . The question in a
> case such as this is whether on the basis of
> quickly unfolding events the defendant's
> response was reasonable under the exigencies
> that existed at the moment.

Id. at 283-84 (citations and quotations omitted).

The Virgin Islands statutory definition of excusable homicide reads as follows:

Homicide is excusable--

(1) when committed by accident and misfortune, or in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent; or

(2) when committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner.

V.I. Code Ann. tit. 14, § 926 (1964). Because the undisputed facts of Robinson's case are inconsistent with paragraph (1) and because we think Robinson admitted using a "dangerous weapon" within the meaning of this statute, we conclude that the trial evidence provided no basis for a jury instruction regarding excusable homicide.

The Virgin Islands excusable-homicide statute does not define "dangerous weapon," nor does any judicial precedent give further content to the term as it is used in that section. We find assistance, however, in the fact that the Virgin Islands' statutory definition of excusable homicide, as well as its definition of justifiable homicide, appear to be a restatement of the common law. See Richard Singer, The Resurgence of Mens Rea: II-Honest But Unreasonable Mistake of Fact in Self Defense, 28 B.C. L. Rev. 459, 472 (1987). Not surprisingly, therefore, the Virgin Islands' excusable-homicide statute is quite similar to excusable-homicide statutes in several states, some of whose

courts have addressed the meaning of "dangerous weapon" in those statutes.

The states of California, Florida, and Mississippi, for example, have statutory definitions of excusable homicide identical or virtually identical to that of the Virgin Islands. See Cal. Penal Code § 195 (West 1988); Fla. Stat. Ann. § 782.03 (West 1992); Miss. Code Ann. § 97-3-17 (1972). The Florida Supreme Court construes "dangerous weapon" as it is used in Florida's statute to mean "any weapon that, taking into account the manner in which it is used, is likely to produce death or great bodily harm." State v. Smith, 573 So.2d 306, 310 (Fla. 1990). Similarly, the Mississippi Supreme Court has construed the term "dangerous weapon" in a predecessor to the current Mississippi statute to mean a weapon "used with such violence as would ordinarily result in the infliction of serious injury." Ayers v. State, 60 Miss. 709, 713 (1883) (ruling that a "billet of wood" was a dangerous weapon when used to strike the deceased in the head and therefore precluded an excusable-homicide jury instruction). See also People v. Dugger, 4 Cal. Rptr. 388, 393 (Cal. Dist. Ct. App. 1960) (bar stool was "dangerous weapon" as used, and precluded excusable-homicide instruction). The Florida and Mississippi definitions also comport with the common law definition of a deadly weapon in the related context of the "deadly weapon doctrine." See Wayne R. LaFave & Austin W. Scott, Jr., Handbook on Criminal Law (1972).

> A deadly weapon is one which, from the manner used, is calculated or likely to produce death or serious bodily injury. Thus whether

> a weapon is deadly depends upon two factors: (1) what it intrinsically is and (2) how it is used. If almost anyone can kill with it, it is a deadly weapon when used in a manner calculated to kill. Thus the following items have been held to be deadly weapons in view of the circumstances of their use: . . . iron bars, baseball bats, bricks, rocks, ice picks, automobiles, and pistols used as bludgeons.

Id. at 537 (footnotes and quotation omitted).

We think it is reasonable and appropriate in construing the term "deadly weapon" in the Virgin Islands' excusable-homicide statute to adopt the Florida and Mississippi courts' construction of their states' excusable-homicide statutes. Adopting their definitions, we do not think it is difficult to determine whether Robinson's use of the two-by-four constituted use of a "deadly weapon." When Robinson picked up the two-by-four and swung it at Stedley, it became a weapon which was likely to cause death or serious bodily injury. Therefore, we hold that the district court did not err in refusing to instruct the jury regarding the defense of excusable homicide.

III.

We will reverse the judgment of the district court and remand the case for a new trial.