**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-2234
_____

THE PEOPLE OF THE VIRGIN ISLANDS

v.

JOSHUA BELARDO,

Appellant
_____

On Appeal from the District Court
of the Virgin Islands, Appellate Division
(Crim. No. 1-06-cr-00023-001)
Panel:  Hon. Curtis V. Gomez, Hon. Raymond L. Finch,
and Hon. Michael C. Dunston

Submitted Under Third Circuit LAR 34.1(a)
May 7, 2010
_____

Before: SMITH, CHAGARES, and JORDAN, Circuit Judges.

(Filed: June 30, 2010)
_____

OPINION
_____

CHAGARES, Circuit Judge.

Joshua Belardo was convicted in the Territorial Court of the Virgin Islands of

third-degree assault, unlawful possession of a firearm during the commission of a crime of violence, and brandishing a deadly weapon, and was sentenced to fifteen years in prison. He appealed his judgment of conviction to the District Court of the Virgin Islands, Appellate Division, which affirmed. He now appeals to our Court. We will affirm as well.

I.

Because we write solely for the benefit of the parties, we will only briefly summarize the essential facts. On April 21, 2004, at about 6:00 p.m. on the Island of St. Croix, Belardo approached Anthony Minto in a parking lot outside the Northside Market. From a distance of approximately thirty feet, Belardo withdrew a chrome and black firearm from his waist, pointed it at Minto, and cranked the slide of the gun back so that a single bullet ejected from the chamber and another bullet loaded.[1] A man with whom Minto had been speaking stepped between Belardo and Minto, attempting to intervene. Meanwhile, the owner of the Northside Market heard the commotion and: (1) went outside; (2) saw an "argument" between Minto and Belardo; (3) saw Belardo point and cock the gun at Minto; and (4) went back inside his store and called the police. Though he twice pointed the gun at Minto, Belardo did not fire it. Instead, he picked up the bullet

---

[1] Minto and Belardo had a contentious history. Minto suspected Belardo of having engaged in an illicit relationship with his teenage daughter, Angela, who is ten years Belardo's junior. Minto had confronted Belardo several times over the alleged relationship, and previously had punched him because of it.

2

that had ejected from the chamber and departed down a nearby road looking for a ride. He ultimately flagged down Renaldo Rivera, a police cadet on the island whom Belardo knew from his neighborhood.

In the car, Belardo told Rivera that he had "had a[n] argument with a guy named Minto and . . . [had] pull[ed] his gun." Appendix ("App.") 153. Belardo also lifted his shirt and showed Rivera the gun. Rivera then dropped Belardo off at home. Based on eyewitnesses' descriptions, Rivera was ultimately tracked down by law enforcement, at which time he provided a statement. The police then obtained an arrest warrant for Belardo and a search warrant for his home. While executing the search warrant, the police discovered a single, live round of ammunition in a bedroom safe. No firearm was recovered.

Belardo was charged with unlawful possession of a firearm during the commission of a crime of violence, in violation of 14 V.I.C. § 2253(a) (Count One); assault in the third degree, in violation of 14 V.I.C. § 297(2) (Count Two); and brandishing and exhibiting a deadly weapon, in violation of 14 V.I.C. § 621(1) (Count Three). App. 9-10. Trial commenced on February 8, 2005, and the jury returned a guilty verdict on all counts the same day. App. 15-16. On June 19, 2006, the trial court denied Belardo's motion for a new trial. App. 91-98. On July 12, 2006, it sentenced him to fifteen years in prison on Count One, five years in prison on Count Two, and one year in prison on Count Three. The sentences on Counts Two and Three were to run concurrently with the sentence on

3

Count One. App. 100-01. Belardo appealed to the District Court, which affirmed the conviction on April 22, 2009. App. 387-412. This timely appeal followed.[2]

## II.

Belardo first argues that he is entitled to a new trial because after-discovered evidence demonstrated that Verna Mae Doward, one of the deliberating jurors at his trial, is the sister of Anthony Minto.[3] He asserts that Doward failed to mention the connection when the venire was questioned during voir dire. The trial court held an evidentiary hearing on the matter on August 24, 2005, and heard argument from counsel on December 14, 2005.

We find it expedient to list the evidence marshaled by both sides. The following documents were proffered to support Belardo's claim that Verna Mae Doward and Minto are related:

- An affirmation of an investigator averring that Clement Doward (a brother of Verna Mae Doward) had stated that Minto was known on the island as his brother. App. 39-40.

- A motion for release, dated September 15, 2003, in Minto's unrelated criminal case. Minto and Vincent Doward, Jr. (another brother of Verna Mae Doward) filed the motion, which represented

[2] The District Court had jurisdiction to review the judgment of the trial court pursuant to 48 U.S.C. § 1613a(a). We have jurisdiction under 48 U.S.C. § 1613a(c), (d).

[3] We review for abuse of discretion the denial of Belardo's motion for a new trial. United States v. Bertoli, 40 F.3d 1384, 1392 (3d Cir. 1994) (citation omitted). In doing so, we credit the court's factual findings absent clear error. United States v. Nolan-Cooper, 155 F.3d 221, 229 (3d Cir. 1998) (citation omitted).

4

that the two were brothers. App. 46-49.

- An amended motion for release, filed on September 19, 2003, this time representing that Minto and Alexis Doward (another brother of Verna Mae Doward) were brothers. App. 50-52.

- An undertaking signed by Minto and Alexis Doward upon Minto's release on the criminal charge. App. 45.

- A notarized, handwritten letter, dated August 30, 2005, from Angela Minto – Anthony Minto's teenage daughter, whom Minto suspected of having engaged in a relationship with Belardo. The letter states in relevant part that Angela understood her grandfather to be Vincent Doward, Sr., Verna Mae Doward's father. App. 42-43.

- A notarized, handwritten letter, dated January 9, 2006, from Angela Minto. The letter states in pertinent part that she had met Verna Mae Doward through her father when she was little, that she knew Verna Mae as "Auntie," that as long as she could remember she knew the Dowards as family, and that "Clement Doward, Alexis Doward, Vincent Doward, [and Verna Mae] Doward are [her] aunt and uncles." App. 64.

- An affirmation from Belardo's post-trial counsel attesting that another brother of Verna Mae Doward – Bradley Christian – told him that "Anthony Minto ha[d] always claimed to be the son of Vincent Doward, Sr, who is the father of Verna[ M]ae Doward." App. 44.

The following evidence was proffered to support the Government's position that Anthony Minto and Verna Mae Doward are either not related or did not know they were related at the time of trial:

- Verna Mae Doward's testimony at the August 24, 2005 hearing that: (1) to her knowledge, Minto is not one of her father's children; (2) to her knowledge, Minto had never claimed to be the child of Vincent Doward, Sr.; (3) to her knowledge, her father never claimed Minto to be his son; (4) before the trial, she knew Minto only in passing, but

5

did not "literally know him"; and (5) before the trial, she did not know Minto by name.  App. 331-34.

- Anthony Minto's testimony at the August 24, 2005 hearing that:  (1) he did not know Verna Mae Doward; (2) he did not know Clement Doward; (3) he did not know who his father was; (4) he had never heard that Vincent Doward, Sr. was his father; (5) no one ever told him who his father was; and (6) he was not interested in identifying his father, nor had he ever attempted to do so.  App. 334-43.

- The signed, September 28, 2005 statement of Alexis Doward – admitted at the August 24, 2005 evidentiary hearing as sworn testimony – acknowledging that he had attested in the amended motion for release that Minto was his brother, but stating that he and Minto were merely childhood friends, and were not biological siblings.  Doward explained that he had stated on the amended motion for release that Minto was his brother "due to the fact that we grew up together as children for so long together around my father but we are not biologically related at all."  Alexis Doward also stated that he did not know the identity of Minto's father.  App. 58-61.

- Minto's birth certificate, showing that his father's name was "Not recorded."  App. 341.

The trial court credited Minto and Verna Mae Doward's in-court testimony over the documentary evidence that Belardo had proffered.  App. 96-97.  It found that "at best," the documents "tend to infer that some people in Ms. Doward's family believed they were related to [Minto]."  App. 97.  But the court concluded that the "documents do not prove . . . that Ms. Doward and [Minto] are related to one another or know one another."  Id.  Because Belardo had not shown that Verna Mae Doward had been untruthful during voir dire, it denied his motion for a new trial.  App. 97-98.  On appeal, the District Court credited the trial court's factual finding about Verna Mae's truthfulness,

6

"particularly where Anthony Minto's birth certificate failed to demonstrate his father's identity or a corresponding familial connection with [Verna Mae] Doward." App. 395.

To obtain a new trial based on a juror's untruthful response to a voir dire inquiry, "a party must first demonstrate that [the] juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984). "Generally, we will not invalidate a jury verdict because of a juror's 'mistaken, though honest' response at voir dire." United States v. Hodge, 321 F.3d 429, 441 (3d Cir. 2003) (quoting McDonough, 464 U.S. at 555).

Belardo admits in his brief that he "cannot prove that Minto and [Verna Mae] Doward [a]re related b[y] blood[.]" Belardo Br. at 15. He is left, then, with challenging Minto's and Doward's testimony that, to the best of their knowledge, they are not related. Id. at 15-17. We cannot say the trial court clearly erred in crediting this testimony. As the court explained, it was in a superior position to assess the veracity of the testimony, and it was entitled to credit such evidence over documentary affirmations not subject to cross-examination. See Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985) ("When [factual] findings are based on determinations regarding the credibility of witnesses, [the plain-error standard] demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.").

7

Additionally, independent evidence supported the finding that Verna Mae Doward honestly believed she was not related to Minto.

Though the documentary evidence that Belardo submitted perhaps would have supported a different finding by the trial court, we are not entitled to disturb the court's factual conclusion where evidence supports it. See Bessemer City, 470 U.S. at 573 ("[The clear-error] standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). The trial court did not clearly err in finding that Verna Mae Doward had been truthful when she did not state during voir dire that she knew or was related to Minto. Accordingly, the court did not abuse its discretion by denying Belardo's motion for a new trial.

## III.

Belardo next challenges three of the trial court's evidentiary rulings.[4]

## A.

The trial court permitted Minto to testify briefly that Belardo had engaged in a relationship with his teenage daughter, Angela, and that the relationship was the source of

---

[4] We generally review evidentiary determinations for abuse of discretion. United States v. Johnson, 388 F.3d 96, 100 (3d Cir. 2004). To the extent our review implicates the interpretation of the Federal Rules of Evidence, our review is plenary. Id. To the extent Belardo failed properly to preserve an objection, we review for plain error. United States v. Iglesias, 535 F.3d 150, 158 (3d Cir. 2008).

several prior confrontations between Minto and Belardo. App. 114-15. Belardo argues that this testimony was irrelevant and prejudicial.[5]

Minto's testimony regarding the alleged relationship and prior confrontations went directly to Belardo's mindset at the time of the April 21, 2004 incident. As discussed infra, to convict Belardo on Count Three, the Government was required to prove that he brandished the firearm in an "angry" manner. A possible basis for Belardo's anger – Minto's earlier attack arising from his daughter's alleged relationship with Belardo – was therefore a probative issue. Moreover, the abbreviated testimony concerning the relationship was not so inflammatory that it became unduly prejudicial. We find no abuse of discretion in the admission of the challenged evidence.[6]

---

[5] Though Belardo objected as Minto began to testify about the relationship, he objected only to Minto's attempt to give hearsay testimony, not to the testimony's relevance or prejudicial effect. App. 114-15. "[A] party fails to preserve an evidentiary issue for appeal not only by failing to make a specific objection, but also by making the wrong specific objection." Iglesias, 535 F.3d at 158 (citations and alteration omitted; emphasis in original). While we would normally review for plain error, since Belardo did properly object to a nearly identical line of questioning on the Government's redirect examination, App. 136-42, for simplicity we will review the entire line of questioning for abuse of discretion. The distinction here is academic.

[6] We reject Belardo's additional suggestion that the testimony was inadmissible under Fed. R. Evid. 404(b). Evidence of a person's prior bad acts is inadmissible to prove that person's conduct in conformity therewith, but "other-crime evidence is admissible if offered for a proper purpose apart from showing that the defendant is a person of criminal character. Such evidence is subject only to the limitations imposed by Federal Rules of Evidence 402 and 403." Gov't of V.I. v. Pinney, 967 F.2d 912, 914 (3d Cir. 1992) (citation omitted). Here, of course, the evidence of the alleged relationship was not used in any way to prove that Belardo acted similarly on April 21, 2004.

9

B.

Belardo attacks as irrelevant and prejudicial the admission of the bullet found in his residence. Because the Government had already adduced testimony that a single bullet had been recovered pursuant to the search warrant, the trial court sustained Belardo's objection when the Government later tried to admit the bullet itself during Officer Jonathan Hitesman's testimony. App. 216-19. Yet on cross-examination, defense counsel challenged Officer Hitesman thoroughly on whether the bullet was, in fact, a live round. App. 219-22. On redirect, the trial court permitted the Government to move the bullet into evidence, stating that defense counsel had "made a big issue of it" on cross-examination. App. 227.

Belardo does not, nor could he, challenge the relevance of the testimony concerning the single bullet, given the earlier testimony demonstrating that a single round had been ejected from the chamber of Belardo's weapon. As such, we are puzzled why admission of the bullet itself would be any less relevant, especially given the attention the bullet received during defense counsel's cross-examination. Nor can we agree, as Belardo posits, that admission of the bullet "appeal[ed] to the jury's sympathies, arouse[d] its sense of horror, provoke[d] its instinct to punish, or otherwise . . . cause[d] [it] to base its decision on something other than the established proposition in the case." Carter v. Hewitt, 617 F.2d 961, 972 (3d Cir. 1980) (citations omitted). Admission of the bullet had no more capacity to inflame the jury's passions than did the testimony about it.

Therefore, the trial court did not abuse its discretion in admitting the bullet into evidence.

## C.

Minto answered affirmatively when asked on cross-examination whether he was "a peaceful fella." App. 132. Based on that answer, defense counsel sought to introduce evidence about a restraining order that Minto's wife had obtained against him after a domestic dispute. App. 133. The trial court commented that defense counsel "never gave any notice to th[e] Court or opposing counsel that [he] wanted to get into" the restraining order. App. 135. The court ruled, however, that inquiry into the restraining order would not be permitted unless and until it heard "a cognizable self-defense claim." App. 136. Belardo challenges that ruling.

We agree with the District Court that it was not an abuse of the trial court's discretion to preclude evidence of the restraining order unless and until Belardo asserted a claim of self-defense. App. 402-04; cf. Fed. R. Evid. 404(a)(2) (permitting admission of evidence of pertinent character trait of alleged victim "to rebut evidence that the alleged victim was the first aggressor").[7] Here, the only relevant use of the restraining order would be to challenge Minto's character for peacefulness, and the only relevant use of Minto's peacefulness, other than impeachment, would be in support of a claim of self

_____

[7] We reject Belardo's argument that evidence of the restraining order was admissible under Fed. R. Evid. 404(b). He fails to explain how that evidence in any way was probative of the alternative purposes for which the rule permits admission of character evidence.

11

defense. The trial court made clear that it would not preclude Belardo from proffering the restraining order if and when he claimed that Minto had been the first aggressor.[8] But Belardo never did so, and he is now ill-positioned to attack the trial court's conditional exclusion of the evidence.

Finally, the District Court correctly recognized that a witness who himself opens the door to his peacefulness runs the risk of being questioned on prior acts that may impeach by contradiction the veracity of his testimony. Cf. Fed. R. Evid. 607; United States v. Greenidge, 495 F.3d 85, 99 (3d Cir. 2007) (citation omitted). As the District Court explained, however, it was defense counsel who elicited Minto's testimony that he considered himself a "peaceful fella." App. 132. As such, it can hardly be said that Minto opened the door to being impeached by the restraining order. See United States v. Kincaid-Chauncey, 556 F.3d 923, 932 (9th Cir. 2009) ("Impeachment by contradiction comes with an important limitation. In general, a witness may be impeached by contradiction only if the statements in issue have been volunteered on direct examination.") (emphasis in original; citation and quotation marks omitted); United States

---

[8] For this reason, we do not agree with the District Court (or Belardo) that the trial court in any way based its exclusion of the evidence on a lack of prior notice of defense counsel's intent to proffer evidence under Rule 404(b). Rather, we read the District Court's stray comment concerning the lack of prior notice – incorrect though it was – as simply that. A fair reading of the transcript clearly reflects that the only basis upon which the trial court conditionally excluded the evidence was the absence of a self-defense claim under Rule 404(a)(2). App. 135-36. The trial court's explicit directive that it would permit the evidence if a claim of self defense was made demonstrates this quite plainly.

12

v. Castillo, 181 F.3d 1129, 1132 (9th Cir. 1999) ("[E]xtrinsic evidence may not be admitted to impeach testimony invited by questions posed during cross-examination.").

IV.

Asserting three arguments, Belardo contends that the trial evidence was insufficient to sustain his conviction.[9] First, he claims that because a firearm was never recovered, a rational jury could not find that he had either possessed a firearm (as that term is defined in the Virgin Islands Code) or brandished a deadly weapon. Second, he argues that the evidence was insufficient to prove that he acted in a rude and threatening manner, elements necessary to sustain the brandishing charge. Third, he asserts that the evidence was insufficient to support the third-degree assault charge because no evidence demonstrated that Minto felt threatened by Belardo's gesture.

Belardo was charged in Count One with unlawful possession of a firearm during the commission of a crime of violence. Title 14 V.I.C. § 2253(a) proscribes the unauthorized "posses[ion] . . . [of] any firearm, as defined in Title 23, section 451(d)" of

---

[9] When reviewing a claim challenging the sufficiency of the evidence, "we must determine whether, viewing the evidence most favorably to the [G]overnment, there is substantial evidence to support the jury's guilty verdict." United States v. Wexler, 838 F.2d 88, 90 (3d Cir. 1988) (citations omitted). If "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we must sustain the conviction. United States v. King, 272 F.3d 366, 370 (3d Cir. 2001) (citation omitted). Belardo's burden "is extremely high." United States v. Lore, 430 F.3d 190, 203 (3d Cir. 2005) (citation omitted). Our review is plenary. United States v. Bornman, 559 F.3d 150, 152 (3d Cir. 2009) (citation omitted).

13

the Virgin Islands Code.[10] As the Government notes, however, the statute provides an enhanced penalty when "such [a] firearm or an imitation thereof" is possessed during the commission of a crime of violence. Id.[11] Thus, it is irrelevant whether a "firearm or an imitation thereof" is actually "capable of discharging ammunition" when the implement is possessed during the commission of a crime of violence.[12] Here, two witnesses testified that they saw the firearm (or, at the very least, a firearm look-alike) in Belardo's physical possession during the altercation with Minto, and Rivera testified that he saw it immediately thereafter. As Belardo attacks no other element of the charged offense, his challenge to Count One fails.

In any event, we believe the evidence was sufficient to permit the jury to infer that

---

[10]"'Firearm' means any device by whatever name known, capable of discharging ammunition by means of gas generated from an explosive composition . . . ." 23 V.I.C. § 451(d).

[11] Assault in the third degree is a crime of violence under Virgin Islands law. See 14 V.I.C. § 2253(d); 23 V.I.C. § 451(e); United States v. Xavier, 2 F.3d 1281, 1289 n.7 (3d Cir. 1993). As we discuss infra, the evidence was sufficient to sustain that predicate charge.

[12] Belardo cites Government of the Virgin Islands v. Greenidge for the proposition that § 2253(a)'s penalty enhancement does not prescribe additional elements of the crime of unlawful possession, and that the Government was thus required to prove that the firearm was indeed operable. 41 V.I. 200, No. 1996-045, 1998 U.S. Dist. LEXIS, at *6 n.2 (D.V.I. 1998); accord Xavier, 2 F.3d at 1291. We disagree. Though Belardo is correct that the enhancement does not establish any additional elements, its plain language clearly provides an alternative means of establishing the already-extant possession element when a crime of violence is involved. In those circumstances, the object possessed may be either an operable firearm as defined in § 451(d) or an inoperable imitation of such a device.

14

the weapon Belardo possessed was indeed operable, and thus "deadly" for purposes of Count Three.[13] See Gov't of the V.I. v. Robinson, 29 F.3d 878, 886 (3d Cir. 1994) ("A deadly weapon is one which . . . is calculated or likely to produce death or serious bodily injury.") (citation omitted). We also find the testimony regarding the April 21, 2004 incident sufficient to support the jury's determination that Belardo had pointed a firearm at Minto in a "rude, angry, and threatening manner." First, Rivera testified that Belardo admitted to him in the car that he had just "had a[n] argument with . . . Minto and . . . that he pull[ed] his gun" on him. App. 153. Second, the evidence established that Belardo cocked the firearm such that one live round was discharged from the chamber and another was loaded. Third, the testimony established that Belardo pointed the weapon at Minto not once, but twice. Fourth, a single, live round was later recovered from Belardo's residence. We conclude that this evidence permitted a rational jury to deduce that when Belardo admitted that he had "pull[ed] his gun," he was admitting that he had pulled an operable firearm. And given the inherently threatening nature of the act itself and the intense history between Belardo and Minto, the testimony easily permitted the jury to conclude that Belardo brandished the firearm in a "rude, angry, and threatening manner."

Finally, we are satisfied that the evidence was sufficient to sustain the third-degree assault charge under 14 V.I.C. § 297(2), which prohibits "assaults with a deadly weapon."

---

[13] Title 14 V.I.C. § 621(1) prohibits, "in the presence of two or more persons" and when "not in necessary self-defense," the "draw[ing] or exhibit[ing] [of] any deadly weapon in a rude, angry, and threatening manner."

15

As we have already concluded, the evidence was sufficient to permit the jury to find that the firearm was operable, and thus deadly. "Assault," in turn, is defined in 14 V.I.C. § 291; as is relevant here, that term means "a threatening gesture showing in itself an immediate intention coupled with an ability to commit a battery." 14 V.I.C. § 291(2). When Belardo cocked the firearm and twice pointed it at Minto, he indisputably made a "threatening gesture," and one which itself displayed both an intention and ability to "batter" Minto.[14] Belardo suggests that Minto did not feel threatened by the gesture. A victim's perception, however, is not a relevant consideration under the plain terms of the statute; the sole focus is on the nature of the defendant's act.

V.

For the reasons stated above, the judgment of conviction will be affirmed.

---

[14] "Whoever uses any unlawful violence upon the person of another with intent to injure him, whatever be the means or the degree of violence used, commits an assault and battery." 14 V.I.C. § 292.