

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-27-1998

# Rios v. Amer Airlines Inc

Precedential or Non-Precedential:

Docket 98-1668

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Rios v. Amer Airlines Inc" (1998). *1998 Decisions.* Paper 270.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/270

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 27, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1668

UNITED STATES OF AMERICA,

v.

AKTHAM ABUHOURAN.
a/k/a "Tony Houran,"

Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 95-00560-04)

Argued: October 7, 1998

Before: BECKER, Chief Judge, NYGAARD and
NOONAN,* Circuit Judges

(Filed November 27, 1998)

      JOSEPH P. GRIMES, ESQUIRE
       (ARGUED)
      Grimes, Grimes, Grimes & Grimes
      1230 Brace Road
      Cherry Hill, NJ 08034

      Counsel for Appellant

_____

*John T. Noonan, Jr., Circuit Judge of the United States Court of
Appeals for the Ninth Circuit, sitting by designation.

MICHAEL R. STILES, ESQUIRE
United States Attorney
WALTER S. BATTY, ESQUIRE
Assistant United States Attorney
Chief of Appeals
ROBERT A. ZAUZMER, ESQUIRE
  (ARGUED)
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Counsel for Appellee

OPINION OF THE COURT

NOONAN, Circuit Judge:

Aktham Abuhouran appeals his conviction of crimes connected to frauds committed against the Bank of Brandywine Valley (BBV) of West Chester, Pennsylvania. Abuhouran is a naturalized citizen of the United States; his americanized name, which will be used in the remainder of this opinion, is Tony Houran. Together with his brothers, Steve and Adam, he was in the construction business and with them owned Houran Construction Co. (HCC). The business became the springboard for Steve to engage in massive fraud upon BBV, As a consequence BBV's capital was depleted to the point that the bank was placed in federal receivership. Just before trial Steve pleaded guilty; Adam stood trial with Tony and was convicted too. In this appeal we consider only Tony's role in assisting Steve in his machinations.

I. The Houran Trading Company (HTC) Loans.  In July 1990 Steve Houran obtained a $350,000 line of credit at BBV for HTC, representing that the loan proceeds would finance HTC's international business in shoes and providing fictitious financial statements and tax returns to substantiate this fraudulent representation. HTC was little more than a shell used to circumvent the limits on loans to a single borrower. The fraud is undisputed. Tony's share in it was an issue at trial.

2

The government contended that Tony's past work in helping Steve get fraudulent loans from other banks, together with the closeness of the brothers in business and at home, showed that Tony must have been aware that Steve was supplying BBV with the false assurance that Tony would guarantee the loan and a false financial statement showing Tony's net worth as $2,262,922. Nonetheless, no one at BBV testified to dealing with Tony on the line of credit, and the government conceded that the note acknowledging the HTC loan carried Tony's forged signature. The jury, or part of it, seems to have been in doubt, for, during its deliberations, the jury asked the judge if, to convict of aiding and abetting, the jury should consider only July 1990 when the line of credit was applied for or whether the jury could consider the time charged in the indictment ranging from July 1990 to February 1992. The judge replied that the jury could consider whether the defendant knew of the crime at any time the scheme to defraud was underway and its participants intended its promotion.

That instruction is challenged on appeal as an amendment of the indictment. The indictment did indeed list as acts performed by Tony only acts in July 1990 relating to the application for credit. What Tony had done in February 1992, which inferentially the jury had in mind, was to lie in a deposition in a civil suit brought by BBV to recover the proceeds of the loan. In this deposition Tony stated that HTC was a bona fide international trading company and implied that he had signed the note which purported to carry his signature. The government argues that his ready participation in this tale in 1992 shows that he had knowledge of the fraud in 1990. If that inference is a good deal less than certain, the government has a fallback position: that Tony's lies in 1992 were meant to keep the fraud from being discovered and were a part of the continuing scheme to defraud. This contention is convincing. The indictment did charge a scheme to defraud, not a single act of fraud. The indictment did say that the scheme lasted until February 1992. The indictment did not have to list every single act by which the scheme was carried out. The indictment did specify that it was only enumerating "in part" the actions taken to effectuate the

scheme. The government argued to the jury that the lies in the deposition were part of the scheme. The defendant had the opportunity to rebut this contention. Tony Houran was properly convicted of aiding and abetting bank fraud in violation of 18 U.S.C. S 1344 and S 2.

II. The Loans To The HCC Subsidiaries. A second scheme to defraud, beginning in April 1991 and running through February 1992, involved the creation of five subsidiaries of the construction company, HCC. The subsidiaries had no purpose but to borrow from BBV. Tony Houran guaranteed a loan of $90,000 from BBV to Diversified Carpentry, Inc., one of these new creations, and he guaranteed a loan of $90,000 from BBV to Masonry Construction Company, a second subsidiary. The misrepresentation of hisfinances that accompanied the guarantees is not disputed on appeal. Bank fraud is established.

III. The Webster Avenue Loans. In June 1991 Steve Houran lined up thirteen straw borrowers, chiefly employees of HCC or relatives, and persuaded them to apply for loans to buy parcels of land and build houses on them on Webster Avenue, Jersey City. The total amount of the loans was $2,420,000. A new entity, Webster Avenue Corporation, opened an account at BBV, and, as the apparent seller of the lots and builder of the houses, became the recipient of these funds. From this account between July 22 and August 15, 1991 Steve Houran transferred over $1,600,000 to Petra Construction Co., which deposited the checks at First Fidelity Bank, Union City, New Jersey. From this account, between August 5 and September 25, 1991, Tony Houran drew eight checks totaling $790,000 payable to HCC and one check of $100,000, dated August 5, 1991, payable to the trust account of Raymond E. Murphy, the Hourans' lawyer. The scheme to defraud is alleged to have run from June 1991 to the date of the indictment, October 3, 1995.

Tony Houran's role in the fraud is summarized by the government in its response to the defendant's Rule 29 motion and in its brief on appeal as "the movement of money." The government points to the checks drawn in August and September 1991 which helped hide the trail and diverted the money from the nominal borrowers to HCC

4

and to the personal needs of the Hourans. The government adds that it proved that Tony Houran was aware of the fraudulent nature of the Webster Avenue loans since he was present at the HCC office when the nominal borrowers signed the loan papers, and he was made aware of the infusion of money into the Petra account. Sufficient evidence was presented for the jury to find that he knowingly abetted the fraud on BBV.

IV. The Bad Checks Scam. Between October 23 and October 25, 1991, Steve Houran deposited at BBV four worthless checks, totaling about $2.4 million, from Kassem Alaouie into the account of Houran Trading Company. HTC's account, which had held around $3,000, swelled mightily. But Steve Houran was aware that he must act fast to benefit from the deposits, for Alaouie had only $1,200 in the account on which the checks were written. Between October 23 and October 29, 1991, Steve Houran wrote ten checks totaling $2,527,812.15 on the HTC account, causing an overdraft of over $100,000, and transferred the money into accounts controlled by the Hourans in banks in New Jersey.

One of the checks on the HTC account, written by Steve on October 25, 1991, was to Tony in the amount of $55,000. Tony deposited it in his account at First Fidelity Bank in New Jersey. On October 31, 1991 he opened a new checking account at Citizens First Bank in New Jersey and wrote a check for $25,000 on the First Fidelity account. He deposited this check in the new checking account at Citizens First.

On October 28, 1991 Steve Houran also wrote a check on the HTC account at BBV for $150,000 payable to Izdehar Houran, Tony's wife. Tony helped his wife open a new account at National Community Bank in New Jersey, in which this check was deposited. On October 31, 1991 Izdehar withdrew the entire amount with a check payable to Tony, which he deposited at a newly-opened savings account at Citizens First. By December 16, 1991 Tony had transferred $125,000 from the savings account to his checking account at Citizens First. On December 16 Tony wrote a certified check on this account made out to himself for $150,000, which he deposited at the HCC account at

5

First Fidelity. The government convincingly contends that this movement of money was in aid of Steve Houran's fraud on BBV in depositing Alaouie's bad checks and immediately drawing on the HTC account before their worthlessness had been determined.

In addition, Tony Houran assisted the fraud in two other ways. When BBV discovered that the Alaouie checks had not cleared, it sought return of the money and, pending restitution, collateral to secure the return. The Houran brothers furnished real estate purporting to have equity in it; in none of the property, including that pledged by Tony, did the Hourans have equity. Tony's second assistance to the fraud was his support of Steve's story of how he had happened to receive the Alaouie checks. According to Steve, he had sold a collection of goods consisting of army boots, blankets, canned tuna, corned beef, sardines, shoes, and sweaters for $3,625,000 to a buyer in Lebanon, who paid the first installment of $2,400,000 by checks to Kassem Alaouie as the broker in the sale; Steve said he had accompanied Alaouie to the bank when the Lebanese checks were deposited and had been assured that they were good; it was a surprise to him when they did not clear, leaving the Alaouie checks to HTC worthless. This tale was of whole cloth, a figment of Steve's imagination. Tony, however, attempted to corroborate it by his deposition on January 5, 1992 testifying that the international deal had taken place and that he had seen Alaouie in Steve's office negotiating the sale. The indictment charged that the fraud, began in October 1991, had continued through February 1992, so that the deposition occurred as the attempt to keep the fraud alive was in progress.

As participant in hiding the money taken, as fraudulent provider of collateral, and as perjurious deponent, Tony Houran abetted his brother's swindle of BBV.

V. Conspiracy to Make False Statements To BBV and To Commit Perjury. Tony Houran was also indicted for conspiring with his brothers to deceive BBV as to the collateral offered and to lie under oath in his deposition given in BBV's collection action. The lies were, as already noted, part of his aid to Steve Houran in the bad check caper. Tony was properly convicted of violation of 18 U.S.C.

6

S 371, an offense distinct from the individual actions he committed.

VI. Money Laundering. Tony Houran was indi cted for, and convicted of, money laundering by his withdrawal of $100,000 from the Petra Construction Co. account on August 5, 1991 by a check payable to the trust account of his lawyer Raymond Murphy, who in turn used the money to pay the mortgage on the Hourans' residence. The reshuffle of a portion of the funds obtained by Steve Houran through the Webster Avenue bank fraud constituted money laundering, that is, the concealment of the bank fraud as well as furtherance of the fraud by concealment.

Money laundering must be a crime distinct from the crime by which the money is obtained. United States v. Conley, 37 F.3d 970, 980 (3rd Cir. 1994). The money laundering statute is not simply the addition of a further penalty to a criminal deed; it is a prohibition of processing the fruits of a crime or of a completed phase of an ongoing offense. Id. at 979. The check to Murphy was the same check referred to in the charge of abetting Steve Houran in the bank fraud involved in the Webster Avenue loans. It could be objected that the act charged as money laundering was not distinct from one of the acts charged as aiding and abetting bank fraud. This objection was not raised at trial; the error, if any, was therefore forfeited, and we review it under the criteria governing our exercise of review under Fed. R. Crim. P. 52(b). A majority of the court is of the opinion that it is sufficient under Conley that a distinct phase of the bank fraud have been completed before the act of money laundering was committed. The majority views the bank fraud which Steve Houran committed and of which the check Tony Houran wrote constituted proceeds, as having already been completed at the time Tony Houran wrote the check. Judge Noonan does not agree with this approach. In the light of the division of the court he does believe that the error, if any, does not meet the criteria set for the recognition of plain error by United States v. Olano, 507 U.S. 725, 730 (1993).

VII. Conspiracy to Commit Money Laundering And  To Transport Money Taken By Fraud In Interstate Commerce.

7

The indictment charged Tony Houran with conspiracy to commit money laundering and to transport in interstate commerce the money fraudulently obtained from BBV by Steve Houran's bad check scam. The conspiracy, however, is a distinct offense from acts by which Tony Houran was proved guilty of abetting the scam. The intentional coordination of Tony's banking moves with Steve's objectives is beyond dispute.

VIII. The Enhancement For Obstruction Of Justice. Tony Houran was released on bail to home confinement with an electronic monitor pending sentencing on August 20, 1997. On August 14, 1997 he cut the monitoring bracelet and made his way to Kennedy Airport where he was apprehended at the ticket counter of Royal Jordanian Airlines with $10,800 in cash attempting to buy a ticket to Jordan. The district court in determining his sentence added two points for obstruction of justice.

On appeal Houran argues that he was not "in custody," so that the example of flight from custody given in Application Note 3 to U.S.S.G. S 3C1.1 does not apply. He argues that his conduct was closer to that governed by Application Note 4, "less serious conduct," such as providing a false name at arrest.

Assuming but not deciding that Houran was not in custody, we find his bold breaking of the bracelet and brazen trip to Kennedy to be a very serious obstruction of justice. His acts were calculated to prevent the culmination of his criminal trial, the judicial imposition of sentence. A more severe obstruction of justice can scarcely be imagined. That his efforts were, at the last minute, foiled neither extenuates them nor renders the enhancement less appropriate.

IX. Minor Issues. Houran objects that the jury foreperson, Susan Moran, disclosed after the trial that she knew the wife of Stephen Bennett, a government witness; the son of the United States Attorney; and the fiancee of the indicted president of BBV. In a post-trial hearing held after these disclosures Moran testified that she did not recognize Bennett's name at voir dire and had never met him; she realized during the trial that his wife had done counseling

8

for her business partner. She did not herself know the United States Attorney and had met his son only once when the son came with a group of teenagers to her house. She discovered after the trial that the fiancee of the bank president was a woman she had met years earlier as her son's camp counselor. In no way had these incidental acquaintanceships affected her impartiality. The district court did not err in finding no impropriety in any respect.

Houran also argues that the government did not establish that BBV was federally insured. To the contrary, Bennett testified that the deposits were insured by the Federal Deposit Insurance Corporation. Christine Scarpedos, an official of the FDIC, testified to the same effect. A juror would reasonably have understood these witnesses to refer to the years in which the deposits were affected by the charged conduct. The argument that a critical element of the government's case was missing is a tardy afterthought, raised for the first time in the Rule 29 motion and defeated by the cited testimony.

For the foregoing reasons, we will affirm the judgment of the district court.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

9