

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-20-2007

# USA v. Greenidge

Precedential or Non-Precedential: Precedential

Docket No. 05-4887

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Greenidge" (2007). *2007 Decisions.* Paper 500.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/500

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-4887

UNITED STATES OF AMERICA

v.

CARLEEN GREENIDGE,
                              Appellant

(D.N.J. Criminal No. 03-cr-00253-4)

No. 05-5083

UNITED STATES OF AMERICA

v.

MARIO PALLITTA,
                              Appellant

(D.N.J. Criminal No. 03-cr-00253-3)

No. 06-2506

UNITED STATES OF AMERICA

v.

JOSEPH DIGREGORIO,
                                    Appellant

(D.N.J. Criminal No. 03-cr-00253-6)

_____

Consolidated Appeal from the United States District Court
for the District of New Jersey
District Judge: Honorable Joseph A. Greenaway, Jr.

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
June 29, 2007

_____

Before: BARRY, FUENTES, and GARTH, <u>Circuit</u> <u>Judges</u>

(Opinion Filed: July 17, 2007)

Rena Rothfeld, Esq.
19-21 West Mt. Pleasant Avenue
Livingston, NJ 07039

        Counsel for Appellant Carleen Greenidge


Kevin F. Carlucci, Esq.
Office of Federal Public Defender
972 Broad Street
Newark, NJ 07102

        Counsel for Appellant Mario Pallitta


Henry E. Klingeman, Esq.

2

Greenberg, Dauber, Epstein & Tucker
One Gateway Center
Suite 600
Newark, NJ 07102-5311

     Counsel for Appellant Joseph DiGregorio

George S. Leone, Esq.
Sabrina G. Comizzoli, Esq.
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

     Counsel for Appellee

———————————

OPINION

———————————

GARTH, <u>Circuit</u> <u>Judge</u>:

Appellants Joseph DiGregorio, Carleen Greenidge, and Mario Pallitta appeal their convictions and DiGregorio appeals his sentence. We have jurisdiction over the challenges to the convictions pursuant to 28 U.S.C. § 1291, and over the challenge to the sentence pursuant to 18 U.S.C. § 3742(a). We will affirm.

I.

In October 2001, the Federal Bureau of Investigation began an investigation into the bank deposits of stolen and altered corporate checks and the wire transfers of proceeds from those checks. The investigation revealed a bank fraud and money laundering conspiracy involving approximately 20 co-conspirators and a theft of over $5 million.

The conspiracy involved essentially three tiers. At the top was Melvyn Waldron, a/k/a "Rankin," who, along with other co-

conspirators, obtained stolen checks from mail rooms and post offices and arranged for those checks to be altered and deposited into various accounts and for the proceeds to be withdrawn. Rankin handed the checks off to Samuel Massaquoi, who served as a liaison between Rankin and Emmanuel Deji, the co-conspirator who altered the payee names on the checks in exchange for a fee. In the middle tier of the conspiracy were the "recruiters." These recruiters solicited "depositors," people on the bottom tier of the conspiracy who were willing to use their personal or business bank accounts to deposit the stolen and altered checks in order to make them appear legitimate.

*DiGregorio*

DiGregorio was recruited into this conspiracy by his bookie, John Elsis, who cooperated with the government and testified at trial. DiGregorio told Elsis that the company for which he worked, KnowYourStuff.com ("KYS"), was struggling financially. Elsis suggested DiGregorio join this scheme in order to obtain cash for the company, telling DiGregorio that "you can erase the name of the company and put your company's name on the check." (Pallitta App. 413.) Elsis told DiGregorio that if he recruited a depositor, the depositor could keep 50% of the proceeds from the check.

DiGregorio recruited the CEO of KYS, William Nash, at a November 2001 meeting also attended by Daniel McGowan, head of sales for KYS. DiGregorio told Nash that he could keep a third of the funds. Nash, who cooperated with the government, testified that in order to keep KYS afloat, he would need approximately $420,000, and so asked DiGregorio to obtain a check for approximately $1.4 million. DiGregorio relayed this request to Rankin, who agreed.

To explain to KYS's employees and investors this large infusion of cash, DiGregorio, McGowan, and Nash invented a business deal with Samsung Electronics and a fictitious third company, "B & D Systems." They memorialized the deal in a fake contract, and asked Rankin to set up a bank account for the phony B & D Systems in order to make a future wire transfer to that account seem legitimate. Rankin registered the fake business with the state, and opened a bank account in the name of B & D

4

Systems.

On November 26, 2001, Rankin and Elsis picked up DiGregorio and Nash and drove to a Merrill Lynch branch office where KYS maintained a bank account. Rankin had a stolen check in the amount of $1,401,647.28. The payee's name had been altered by Deji, and after examining the check, DiGregorio and Nash commented that it looked "good." Nash deposited the check. During the ride back to KYS, Nash told Rankin, in DiGregorio's presence, that if Rankin gave him his account number, Nash would wire a portion of the funds to the B & D Systems account.

DiGregorio informed Elsis when the check cleared. On December 6, 2001, Nash wired $980,000 from the KYS account to the B & D Systems account. Nash used $260,000 of the proceeds for business expenses, including employee backpay. From this $260,000, DiGregorio received $10,500 to represent his purported "sales commission" from the phony Samsung/B & D Systems deal, and another $8,000 in salary and backpay.

On December 21, 2001, Nash's Merrill Lynch broker called him to inform him that the check had been fraudulent. Merrill Lynch froze the remaining $160,000 in the account. Nash informed DiGregorio and McGowan, and they agreed to continue representing that the source of the money was a legitimate business deal between Samsung Electronics and B & D Systems. Nash typed a script and gave DiGregorio and McGowan copies. When interviewed by members of the United States Attorney's Office, DiGregorio told this story, which became the basis of an obstruction of justice enhancement at sentencing.

*Greenidge*

Greenidge was recruited by Kenson Gilbert, who cooperated with the government and testified at trial. In October 2001, Greenidge met with Gilbert and co-conspirator George Nicholas. At this meeting, Gilbert explained that Rankin would deposit a stolen and altered check into the account of the moving and storage company Greenidge owned and operated, Signature Van Lines. Gilbert said that they would split the proceeds of the check, with 50% going to Greenidge and 50% to Rankin. Greenidge agreed to

5

the plan, and Gilbert told her that she would be instructed how and when to withdraw the money from her business account in order to avoid suspicion by the bank.

A few days later, Greenidge met with Gilbert, Nicholas, and Rankin. Greenidge gave Rankin her business name, business account number at HSBC Bank, and personal identification number ("PIN").

On November 17, 2001, Rankin deposited a stolen check for $253,000.00 into the Signature Van Lines account. Deji had altered the name of the payee on the check.

A week later, the check cleared. Greenidge met with Rankin and Gilbert and gave Rankin an envelope containing several checks from Signature Van Lines. Rankin gave Greenidge the account number for B & D Systems and told Greenidge to transfer his remaining share of the proceeds there. On November 30, 2001, Greenidge wire transferred $68,047.21 from her business account into the B & D Systems account.

*Pallitta*

Pallitta, like DiGregorio, was recruited into the conspiracy by Elsis. Pallitta knew Elsis because Pallitta placed bets with Elsis and Elsis's bookmaking partner, Joe Bellero. In November 2001, Elsis and Bellero recruited Pallitta to be a depositor on behalf of Anthony Dunlock, a construction worker who had been performing work on Elsis's home. Dunlock asked Elsis if Elsis could help him "get rid" of some stolen checks. (Pallitta App. 408.) Elsis approached Bellero, who recruited Pallitta. They decided that Pallitta would earn 50% of the check's proceeds, while Rankin would keep 40%, and Bellero and Elsis would each keep 5%.

Elsis discussed with Pallitta the specifics of the scheme, telling him that the checks were stolen and that the names of the payees were electronically altered so that the bank could not detect the fraud, and, on Rankin's instruction, asked Pallitta how much he would be willing to deposit into his business account. Pallitta responded that because his account was frequently overdrawn, he did not want a large check which would arouse the bank's

6

suspicion. Pallitta and Elsis agreed that Pallitta would deposit a check for approximately $130,000.

On November 26, 2001, Rankin, Elsis, and Pallitta met at an empty dry cleaning business next door to Amici's Restaurant, the pizzeria Pallitta owned. Rankin gave Pallitta a stolen check in the amount of $138,494.30. Deji had altered the name of the check's payee. Pallitta examined the check and said that it looked "good." (Pallitta App. 410.)

Pallitta provided Rankin with a pre-printed deposit slip for Amici's Restaurant's bank account, and Rankin deposited the check in the bank across the street. When Rankin returned, Pallitta gave him his business account number, PIN, and the bank's telephone number so that Rankin could call to find out when the check cleared.

Later that day, Pallitta called the assistant bank manager to ask when the funds would be available for withdrawal. The assistant manager became suspicious because the deposit was so large compared to the $11.30 account balance and the fact that the account was frequently overdrawn. She examined the check and noticed that the name of the payee was typed in a slightly larger and darker font than the other print on the check. After showing the check to the bank manager, the bank put a hold on the account. None of the funds were withdrawn.

*Arrests and Procedural History*

The arrests began with Rankin, in January 2002. The arrests continued in February (Gilbert and Massaquoi); August (Elsis); and September (DiGregorio, Nash, Pallitta, and Bellero). In April 2003, Greenidge, Deji, and Dunlock were arrested.

On October 23, 2003, DiGregorio, Greenidge, and Pallitta were charged in a nine-count superseding indictment with other defendants including Deji and McGowan. Count One charged Pallitta, Greenidge, and Deji with conspiracy to commit bank fraud, contrary to 18 U.S.C. § 1344 and in violation of 18 U.S.C. § 371. Count Six charged Pallitta with aiding and abetting the crime of bank fraud, in violation of 18 U.S.C. § 1344 and 18 U.S.C. § 2.

7

Count Seven charged Pallitta, Greenidge, DiGregorio, and McGowan with conspiracy to engage in a monetary transaction involving the proceeds of criminally derived property, contrary to 18 U.S.C. § 1957(a) and in violation of 18 U.S.C. § 1956(h).

Trial began on January 18, 2005 before the Honorable Joseph A. Greenaway.[1] Co-conspirators Massaquoi, Gilbert, Elsis, and Nash testified for the government at trial. On March 1, 20005, the jury found DiGregorio, Pallitta, and Greenidge guilty on all applicable counts,[2] but acquitted McGowan. DiGregorio was sentenced to 41 months of imprisonment; Pallitta to 30 months; and Greenidge to 33 months. All three defendants appeal their convictions, and DiGregorio appeals his sentence as well.

## II.

### A. Variance between the Indictment and the Proof at Trial

Claiming a variance between the indictment and the proof at trial, all three appellants challenge their convictions for conspiracy to engage in a monetary transaction involving the proceeds of criminally derived property (Count Seven), and Greenidge and Pallitta also challenge their convictions for conspiracy to commit bank fraud (Count One).[3] According to appellants, while the indictment alleged a single conspiracy for each count, the evidence

---

[1]Judge Greenaway also accepted the guilty pleas of, among others, Rankin, Nash, Elsis, Gilbert, Bellero, Dunlock, and Massaquoi. These defendants have either not yet been sentenced, not filed notices of appeal of their sentences, or, in the case of Bellero, died before sentencing.

[2]The jury convicted Deji on Counts One through Four, Eight, and Nine. This Court dismissed Deji's appeal on August 29, 2006 because he is a fugitive.

[3]Although Pallitta did not raise this issue in his opening brief, pursuant to Rule 28(i) of the Federal Rules of Appellate Procedure, in his reply brief he joined the argument made by Greenidge and DiGregorio on this issue.

at most demonstrated separate conspiracies—a conspiracy per appellant per count. They contend that the District Court erred by finding no variance between the proof and the indictment and by refusing to give appellants' proposed jury instruction on whether the evidence established a single conspiracy or multiple conspiracies.[4]

This Court will vacate a conviction "where a variance between the indictment and proof at trial exists to the prejudice of a defendant's substantial rights." *United States v. Salmon*, 944 F.2d 1106, 1116 (3d Cir. 1991) (citing *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989)). The "variance doctrine is intended to prevent a situation in which the jury might be unable to separate offenders and offenses and easily could transfer the guilt from one alleged co-scheme to another." *United States v. Barr*, 963 F.2d 641, 648 (3d Cir. 1992) (internal citations and citations omitted).

We examine alleged variances "on a case-by-case basis." *United States v. Perez*, 280 F.3d 318, 346 (3d Cir. 2002). If, viewing the evidence in the light most favorable to the government, *see Barr*, 963 F.2d at 648, a rational trier of fact could have concluded from the proof adduced at trial the existence of the single conspiracy alleged in the indictment, there was no variance. Furthermore, a district court can properly refuse a defendant's request for a jury instruction on single versus multiple conspiracies if there is insufficient evidence to support such an instruction. *See Barr*, 963 F.2d at 650.

In *United States v. Kelly*, 892 F.2d 255 (3d Cir. 1989), this Court set forth a three-step test to aid in distinguishing between single and multiple conspiracies.

---

[4]A relevant portion of the proposed jury instruction read:

Even if the evidence in the case shows that Defendant _____ was a member of some conspiracy, but that this conspiracy is not the single conspiracy charged in the indictment, you must acquit Defendant _____ of this charge.

2 Fed. Jury Prac. & Instr. (Crim.) § 31.09 (5th ed.).

First, we examine whether there was a common goal among the conspirators. Second, we look at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators. Third, we examine the extent to which the participants overlap in the various dealings.

*Id.* at 259 (citations and internal quotations omitted). The absence of one of these factors "does not necessarily defeat an inference of the existence of a single conspiracy." *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992).

We now turn to the issue of whether, applying the *Kelly* factors, the jury had a reasonable basis for finding the existence of a single conspiracy to commit bank fraud (Count One). There was certainly evidence of a common goal among these co-conspirators: to make money by depositing stolen and altered corporate checks into business accounts. As to the whether the "nature of the scheme" indicates a single conspiracy, we look to whether there was evidence that "the activities of one group . . . were 'necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture.'" *Kelly*, 892 F.2d at 259 (quoting *United States v. DeVarona*, 872 F.2d 114, 118 (5th Cir. 1989)). There was evidence to support this factor as well: the activities of Greenidge and Pallitta as depositors—including having access to corporate bank accounts and providing Rankin with account numbers, PINs, and deposit slips—were necessary to the overall success of the venture. Without a constant supply of willing depositors, the operation would necessarily have ceased. Finally, there was a great degree of participant overlap in this plan. The checks Greenidge and Pallitta deposited came from the same source (Rankin), and they were altered by the same person (Deji) for the same reason (to pass the scrutiny of the banks). They worked with a network of recruiters, including Gilbert and Elsis, to find depositors, such as Greenidge and Pallitta. Keeping in mind that "the government need not prove that each defendant knew all the details, goals, or other participants in order to find a single conspiracy," *Kelly*, 892 F.2d at 260 (internal citation omitted), we find that here there was sufficient evidence to demonstrate a single

10

conspiracy.

The evidence also supported the jury's finding of a single conspiracy to engage in a monetary transaction involving the proceeds of criminally derived property (Count Seven). The common goal here was to share in the illegal proceeds resulting from the deposit of the stolen and altered checks. The participants in the deposit of $1.4 million to KYS agreed to a division of funds, from which DiGregorio received $18,500; Rankin and Greenidge agreed to split evenly the proceeds from the Signature Van Lines deposit, with Gilbert's commission coming from Rankin's share; and the participants in the Amici's Restaurant deposit agreed that Pallitta would receive half of the proceeds, whereas Rankin would keep 40%, and Bellero and Elsis would each keep 5%. Furthermore, the nature of the scheme indicates a single conspiracy. For instance, DiGregorio assisted Nash in conceiving of the phony "B & D Systems" company so that Nash could transfer the funds to a dummy account Rankin could set up in that name; Greenidge wire transferred $68,047.21 from the Signature Van Lines account into Rankin's B & D Systems account six days after the deposited stolen check cleared; and Pallitta gave Rankin his business account number, PIN, and the bank's telephone number so that Rankin could call to find out when the check cleared. Finally, there was a great degree of participant overlap here as well. For example, all three appellants intended to split the proceeds with Rankin, and Elsis profited from the transactions involving both DiGregorio and Pallitta.

Appellants contend that this case is analogous to *Kotteakos v. United States*, 328 U.S. 750 (1946). That case involved a scheme where one person, Simon Brown, sold his services in falsifying loan applications on behalf of numerous unrelated applicants. Despite no evidence of any connection between the loan applicants other than the fact that they had used Brown to obtain their loans, *id.* at 755, the indictment charged that the applicants participated in only a single conspiracy. The Court, analogizing this plan to a rimless wheel, in which Brown was the hub and the other alleged co-conspirators were unrelated spokes, *id.* at 755, found that the variance "affect[ed] the substantial rights of the parties," *id.* at 775, and was reversible error.

Contrary to appellants' contention, however, the circumstances here are readily distinguishable from those in *Kotteakos*. We agree with the government that this scheme did not resemble a wheel-hub-spoke conspiracy, but instead could be more accurately depicted as a pyramidal corporate structure. At the base of the pyramid were the depositors, such as Pallitta and Greenidge. Above them were the recruiters, including DiGregorio, Elsis, and Gilbert, who received a finder's fee for every depositor they recruited who successfully deposited a stolen and altered check. And at the top, were Rankin, the source of the stolen checks, Deji, the check alterer, and Massaquoi, their liason. Unlike in *Kotteakos*, the depositors did not represent independent customers, but were an integral part of this "corporate" structure. *See Perez*, 280 F.3d at 346 ("a finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies and, therefore, would not create an impermissible variance") (citation and internal quotations omitted).

We thus find that the evidence did not demonstrate the existence of "separate independent networks," but rather, as the indictment charged, a single conspiracy, and thus the District Court's refusal to give a multiple conspiracies jury instruction was proper. *Barr*, 963 F.2d at 650. Furthermore, "even if a multiple conspiracies charge should have been given, reversal on appeal is *not* automatic." *Id.* (citation omitted). The convictions cannot be vacated unless appellants show "both the likelihood of multiple conspiracies having existed, and substantial prejudice resulting from the failure to give the requested charge." *Id.* (quotation and citation omitted). Appellants have not demonstrated that there was prejudice here from any "spillover" evidence.[5] First of all, the government compartmentalized its presentation of evidence, presenting evidence as to each defendant separately. Secondly, the District Court properly charged the jury to consider the evidence

---

[5]No appellant claims any other type of prejudice, such as unfair notice or the erroneous admission of co-conspirator statements.

against each defendant separately.[6]  Most importantly, the fact that the jury acquitted McGowan is critical proof that the jury was "able to separate the offenders and the offenses."  *Id.*

## B.  Evidentiary Rulings

### 1. *The Admission of Pallitta's Prior Conviction*

Pallitta claims the District Court erred by admitting into evidence a stipulation that Pallitta had been convicted of theft in 2001.  We review for abuse of discretion.  *See United States v. Saada*, 212 F.3d 210, 220 (3d Cir. 2000).

The conviction at issue concerned Pallitta's theft from his employer.  As a delivery person for a liquor distributor, Pallitta made deliveries and accepted payment on behalf of his employer.  Instead of turning those payments over to his employer, however, Pallitta kept them for himself.  On January 2, 2001, he pled guilty in New Jersey state court to theft for failure to make required disposition of property, a third degree felony.

Before deciding whether to testify in his own defense, Pallitta moved *in limine* to exclude this evidence so that it could not be used to impeach him.  He conceded that the theft conviction was

---

[6]The District Court instructed:

> Each count and the evidence pertaining to it should be considered separately.  Also, the case of each defendant should be considered separately and individually.  The fact that you may find one defendant guilty or not guilty of any of the offenses charged should not control your verdict as to any other offense charged or any other defendant.  And even though I will discuss related charges together because they share common legal and factual elements, you must consider each count and each defendant separately.

(Pallitta App. 1612.)

probative of his credibility, but argued that its similarity to the alleged bank fraud rendered it overly prejudicial, so that it should be excluded under Rule 609(a)(1) of the Federal Rules of Evidence.[7] The District Court disagreed that the offense of stealing from one's employer and committing a fraud on a bank were so similar as to lead to a propensity inference, that is, an inference that because "he stole once, he'll steal again." (Pallitta App. 624.) The District Court ruled that the conviction was admissible under Rule 609(a)(1) for impeachment purposes if Pallitta chose to testify.

While Pallitta did not take the stand, he did subpoena Anthony Dunlock to testify. Dunlock testified that when, after the check had been deposited but he had not received his cut from the proceeds, he went to see Pallitta to attempt to collect his share. Pallitta's counsel then attempted to elicit from Dunlock an out-of-court statement made by Pallitta to Dunlock. Over the government's objection that this statement was hearsay which did not fall within any exception to the hearsay rule, the District Court permitted Pallitta's counsel to ask what Pallitta said in that conversation:

Q: Mr. Dunlock, what was Mr. Pallitta's response when you attempted to collect money from him?

---

[7] Rule 609(a)(1) states:

For the purpose of attacking the character for truthfulness of a witness, evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused[.]

Fed. R. Evid. 609(a)(1).

14

A:     He had informed me that he didn't know it was going to be something like this. You know, that Joseph [Bellero] had lied to him.

Q:     When he said he didn't know it was going to be like this, what was your understanding?

\*\*\*

A:     [Pallitta] said he thought it was coming from overseas, or something. And if he had known that, he wouldn't use his account, set up a dummy account, or something.

\*\*\*

Q:     By "had known this," do you know what he was talking about?

A:     I guess knowing that it was going to be like this, the way it was.

Q:     What way was it?

A:     The way the checks were deposited in his account.

Q:     Was it that the checks were fraudulent or stolen?

A:     I guess so, yes.

\*\*\*

Q:     So if he told you, if he knew it was like that, that is, the checks were stolen or fraudulent, he would not have deposited it in his own account. Correct?

A:     Correct.

(Pallitta App. 630.)

As the District Court noted, through Dunlock Pallitta succeeded in his "attempt to introduce exculpatory evidence." (Pallitta App. 821.) As the government points out, this statement, offered for its truth, suggested that Pallitta did not act "knowingly"—that he did not have a specific intent to defraud and that he did not knowingly attempt to engage in a monetary transaction in criminally derived property—and therefore supplied

15

a complete defense to an essential element of both charged crimes.[8]

After Pallitta's statements were admitted, the government moved, per Rule 806 of the Federal Rules of Evidence, that Pallita's theft conviction be admitted to challenge the credibility of the declarant (Pallitta), just as the conviction would have been admitted, per the District Court's earlier decision, if Pallitta had testified himself. Rule 806 provides, in relevant part, that "[w]hen a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if the declarant had testified as a witness." Fed. R. Evid. 806. As the Advisory Committee Notes emphasize, "[t]he declarant of a hearsay statement which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified." Fed. R. Evid. 806 Advisory Committee Notes. *See also Saada*, 212 F.3d at 221 (noting that pursuant to Rule 806, "the credibility of the hearsay declarant . . . may be impeached with . . . evidence of criminal convictions under Rule 609").

The District Court, having already ruled the prior conviction admissible under Rule 609 if Pallitta testified, admitted the conviction under Rule 806. Pallitta claims this was an abuse of discretion. We disagree.

In determining whether "the probative value of admitting [the conviction] outweigh[ed] its prejudicial effect"[9] to Pallitta, Fed.

---

[8]In fact, in his closing argument Pallitta's counsel invoked Dunlock's testimony, *see* Pallitta App. 1442 ("[Dunlock] said that Mario Pallitta said he wouldn't have done this had he known this check was stolen."), to argue that Pallitta did not act knowingly.

[9]Pallitta argues that "the introduction of prior convictions under Rule 609 is subject to Rule 403." Pallitta Br. 24. This contention is overbroad. The Rule 403 considerations apply to "evidence that a witness *other than an accused* has been convicted of a crime," Fed. R. Evid. 609(a)(1) (emphasis added), while "evidence that *an accused* has been convicted of such a crime" is

16

R. Evid. 609(a)(1), the District Court engaged in its analysis using the four factors set forth in *Gov't of the Virgin Islands v. Bedford*, 671 F.2d 758 (3d Cir. 1982), namely (1) the kind of crime involved, (2) when the conviction occurred, (3) the importance of the witness' testimony to the case, and (4) the importance of the credibility of the defendant. *Bedford*, 671 F.2d at 761 n.4. The District Court noted that the prior conviction was not remote in time from the instant offense, *see* Pallita App. 625, that the importance of the witness/defendant's credibility was "overwhelming," *see* Pallitta App. 624, and, with regard to the kinds of crimes involved, stated that it was "not convinced that these [crimes] are sufficiently similar . . . [that the jury] will come to the same conclusion with regard to the instant charge based on the introduction of the prior conviction." (Pallitta App. 624.) In addition, the District Court minimized any prejudice that may have resulted from the conviction's admission by having the fact of the conviction admitted via a stipulation which simply read: "on or about January 2nd of 2001, defendant Mario Pallitta entered a plea of guilty to the offense of theft by failure to make required disposition of property, received in New Jersey Superior Court in Hudson County, New Jersey." (Pallitta App. 1272.) The Court also issued a limiting instruction accompanying the stipulation, instructing the jury that it could only consider the prior conviction in regard to Pallitta's credibility and not as evidence that he is a "bad person or has a propensity to commit crimes" or as evidence that he committed the crimes charged in the indictment. (Pallitta App. 1273.) Finally, the Court gave a second limiting instruction to the same effect in its final instructions to the jury. *See* Pallitta App. 1622.

There was no abuse of discretion here. Pallitta conceded that his earlier conviction had probative value regarding his credibility. Furthermore, due to the fact that the out-of-court statements, if believed, provided a complete defense to the crimes, both Pallitta's credibility and the statements' importance to the case cannot be overstated. We also cannot conclude that the crime of

admissible if "the probative value of admitting this evidence outweighs its prejudicial effect to the accused." *Id.* (emphasis added).

17

stealing money from one's employer is so similar to the crimes of committing a fraud on a bank and money laundering that the probative value of the conviction's admission is outweighed by the conviction's prejudicial effect to Pallitta.[10] The limiting instructions were a proper countermeasure to any improper uses of the evidence the jury may have been tempted to make. In sum, Pallitta's appeal on this ground must be rejected.

## 2. *The Impeachment by Contradiction of Greenidge*

Greenidge claims that the District Court erred by allowing the government to cross-examine her about a consumer complaint and a criminal complaint against her. We review this evidentiary ruling for abuse of discretion. *See Saada*, 212 F.3d at 220.

During her direct testimony, Greenidge sought to portray herself as an honest businessperson. She testified that at the time of the alleged criminal activity, she was negotiating to acquire various businesses and was seeking out funding for those acquisitions. Greenidge explained that she was merely negotiating a legitimate loan from Rankin, and knew nothing about Rankin's scheme or that the $253,000 check Rankin deposited into her account had been stolen or altered. She emphasized her

---

[10]We reject Pallitta's policy argument that a court's evaluation, pursuant to Rule 609, of the probative value and prejudicial effect of an accused's conviction is somehow altered when the conviction is to be used, pursuant to Rule 806, to impeach a non-testifying *defendant*-declarant. Pallitta offers no case law in support of his argument, and the one law review article he cites makes the point that "where the defendant has chosen to tell his story through his own hearsay statements rather than by taking the witness stand . . . it is arguably *more important* to allow impeachment [by conviction] in this context, because the defendant has avoided the rigors of cross-examination by introducing his hearsay statements rather than testifying." Margaret Meriweather Cordray, *Evidence Rule 806 and the Problem of Impeaching the Nontestifying Declarant*, 56 Ohio St. L. J. 495, 504 (1997). We see no basis for altering the Rule 609 balancing in the circumstances of a non-testifying defendant-declarant.

18

professionalism, noting that she had been in the moving and storage business for 15 years and telling the jury: "I'm not a thief. I do not steal. I was raised with very strong convictions and I did business honestly." (Pallitta App. 764.) Greenidge also unequivocally denied ever having had any criminal problems or receiving any complaints about her honesty in business:

Q:     Have you ever, in those 15 years, had any problems, any criminal problems?

A:     No.

Q:     With respect to yourself, or this business, any business that you were in?

A:     Never.

Q:     Have you ever had anybody complain about you to a company and say, don't deal with her, she's not honest?

A:     Never did.

(Pallitta App. 761.)

The government moved for permission to impeach Greenidge's statements with both a customer complaint from 2004 that Greenidge had refused to relinquish the customer's furniture until the customer paid $500 beyond what was owed, and a criminal complaint charging Greenidge with theft. The criminal complaint charged Greenidge with theft "by unlawfully taking or exercising control over certain immovable property," and arose when Budget Rental reported to the Newton, New Jersey Police Department that Greenidge had rented its trucks but failed to return them, accruing a debt of approximately $4,000. Greenidge's counsel told the Court that the Newton Police Chief agreed that this dispute was a civil, not a criminal, matter; that the Chief had agreed to hold the complaint pending the parties' negotiation of a payment schedule; and that Greenidge had not been arrested on the complaint and that the arrest warrant had been withdrawn.

The District Court decided that, due to Greenidge's

19

"unequivocal statement" that there had never been any complaints about the way she conducted business, the government's proposed cross-examination was "a fair area of inquiry." (Pallitta App. 773.) Nevertheless, the Court, seeking to find an "appropriate middle ground" between the probative value of the questioning and the prejudice to Greenidge, allowed Greenidge to be cross-examined on the existence of the complaints but not on the arrest warrant, and did not admit the documents into evidence. (Pallitta App. 770.)

"Where a defendant testifies on direct examination regarding a specific fact, the prosecution may prove on cross-examination that the defendant lied as to that fact." *United States v. Gambino*, 951 F.2d 498, 503 (2d Cir. 1991) (citation and internal quotation omitted). In this way, impeachment by contradiction is a means of "arriving at the truth in criminal trials" by policing the "defendant's obligation to speak the truth in response to proper questions." *United States v. Havens*, 446 U.S. 620, 626 (1980).

Impeachment by contradiction is permitted by Rule 607 of the Federal Rules of Evidence, which provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Fed. R. Evid. 607. The court, in deciding whether to allow an instance of impeachment by contradiction, engages in a Rule 403 analysis, *see United States v. Castillo*, 181 F.3d 1129, 1133 (9th Cir. 1999) (noting that Rule 607 allows admission of extrinsic evidence to impeach by contradiction, subject to Rule 403 considerations), whereby the offered evidence can be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

The District Court did not abuse its discretion in allowing the government to cross-examine Greenidge about the two complaints. Greenidge concedes that her volunteered denials "opened the door" to this area of inquiry. Greenidge Br. 21; *see also Castillo*, 181 F.3d at 1133 ("Courts are more willing to permit, and commentators more willing to endorse, impeachment by contradiction where . . . testimony is volunteered on direct examination."). Furthermore, as the government argues,

20

Greenidge's unqualified denial in her direct testimony rendered the impeachment by contradiction more probative of her credibility. In addition, the District Court sought to minimize any unfair prejudice to Greenidge by not allowing the government to introduce the complaints into evidence, nor to mention the existence of the arrest warrant. Finally, Greenidge was given the opportunity to explain her seemingly inconsistent answers to the jury. We cannot conclude that this evidence was erroneously admitted.

### C. Motion for Judgment of Acquittal

Pallitta and DiGregorio both appeal the District Court's denial of their motions, under Rule 29 of the Federal Rules of Criminal Procedure, for a judgment of acquittal on the charge of conspiracy to engage in a monetary transaction involving the proceeds of criminally derived property (Court Seven). We review the appellants' claim that there was insufficient evidence to sustain their conviction on this count using the same standard the District Court applied, that is, viewing the evidence in the light most favorable to the government, we "will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998) (internal citation omitted). This standard "places a very heavy burden on an appellant." *Id.* (citation omitted).

The elements of a conspiracy under 18 U.S.C. § 1956(h) are: (1) that an agreement was formed between two or more persons; and (2) that the defendant knowingly became a member of the conspiracy. 18 U.S.C. § 1956(h); *see also Whitfield v. United States*, 543 U.S. 209, 214 (2005) (finding that the government need not prove an overt act in order to obtain a conviction under 18 U.S.C. § 1956(h)). The elements of the substantive crime the appellants were charged with conspiring to commit are: (1) the defendant engaged or attempted to engage in a monetary transaction;[11] (2) involving criminally derived property of at least

---

[11]The statute defines a "monetary transaction" to be a "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds . . . by, through, or to a

21

$10,000; (3) that the property was in fact derived from specified unlawful activity; (4) that the defendant acted knowingly, that is, with knowledge that the property was derived from the proceeds of a criminal offense; and (5) that the transaction occurred in the United States. 18 U.S.C. § 1957(a), (d).

Pallitta claims that there was insufficient evidence to convict him of conspiracy to engage in money laundering (Count Seven) because the financial transaction used to support the money laundering charge was the same transaction as that used to support the bank fraud charge (Count One). In other words, he argues that Count Seven was indistinct from Count One, and because "[m]oney laundering must be a crime distinct from the crime by which the money is obtained," *United States v. Abuhouran*, 162 F.3d 230, 233 (3d Cir. 1998) (citation omitted), his conviction on Count Seven must be reversed.

We agree, of course, that in order to support a charge of money laundering, there must have been a "discrete predicate crime" which "produced proceeds in acts distinct from the conduct that constitutes money laundering." *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998). *See also United States v. Conley*, 37 F.3d 970, 980 (3d Cir. 1994) (commenting that before "proceeds" can be laundered, they must be "derived from an already completed offense, or a completed phase of an ongoing offense"). Drawing on this principle, Pallitta contends that the bank fraud conspiracy produced no "proceeds" until the funds were withdrawn, and thus there was only a single transaction, not the completion of one followed by another which used the proceeds from the first.

We disagree, and instead are persuaded by the government's argument that the conspiracy to commit bank fraud was complete when the stolen and altered check was deposited. The bank fraud statute involved here makes it a crime to "knowingly execute[], or attempt[] to execute, a scheme or artifice to defraud a financial institution." 18 U.S.C. § 1344(1). When the check was deposited, the "scheme . . . to defraud" the bank had been "execute[d]." As

_____

financial institution." 18 U.S.C. § 1957(f).

the Eleventh Circuit has stated:

> Here [the defendant] was in the same position as if he had robbed the bank and placed the proceeds of the robbery into his own account with the intent to use the money for his own purposes. The crime was completed at that point, without any actual withdrawal of the money.

*United States v. Gregg*, 179 F.3d 1312, 1315 (11th Cir. 1999). *See also United States v. Hord*, 6 F.3d 276, 281 (5th Cir. 1993) (bank fraud indictment that charged withdrawals as well as deposits not multiplicitous because "[i]t is the deposits, not [the] withdrawal attempts, that constitute executions of the scheme"). Because we conclude that the conspiracy to commit bank fraud was "executed" when the check was deposited, the proceeds from that completed crime qualified as the "criminally derived property" used to support the charge of conspiracy to engage in money laundering. In sum, we find Counts One and Seven to be based on two distinct events.

Furthermore, there was sufficient evidence for the jury to convict Pallitta of conspiracy to engage in a monetary transaction involving the proceeds of criminally derived property. Elsis testified that the co-conspirators agreed how to split the proceeds from the altered check after the money was withdrawn. (Pallitta App. 421.) Pallitta thus knew, when he joined the conspiracy, that either he or a co-conspirator would withdraw proceeds of the stolen check from the bank once the check cleared. In fact, there was evidence that Pallitta, knowing the check was stolen, called the bank several times on the day of the check's deposit to determine if it had cleared. (Pallitta App. 591.) Because there was evidence that Pallitta, knowing the check had been stolen and altered, agreed to help facilitate the withdrawal of the check's illegal $134,494.30 proceeds, a jury could have found each element of the crime beyond a reasonable doubt and so we will affirm the denial of his Rule 29 motion on Count Seven.[12]

---

[12]It is, of course, of no consequence that the bank recognized the fraud and the proceeds were never actually withdrawn, because the "illegality of the agreement does not depend on the

23

Next, DiGregorio contends that there was insufficient evidence for the jury to convict him on Count Seven. He maintains that though he was present when Nash deposited the altered check, he had no later involvement in Rankin's efforts to collect the funds, and because, he argues, the bank fraud proceeds did not exist until Rankin withdrew them, there was insufficient evidence that DiGregorio participated in the conspiracy to engage in this monetary transaction.

This argument is rejected. As we discussed above, the bank fraud proceeds existed when the check was deposited. In addition, there was evidence that in November 2001, DiGregorio agreed with Elsis to propose the plan to Nash whereby a stolen and altered check would be deposited into the KYS account, and that the withdrawn illegal proceeds would be used both to keep KYS afloat and to compensate the conspirators for their role in the scheme. Indeed, in order to ensure that there were sufficient proceeds from this illegal venture, there was evidence that DiGregorio asked Elsis for a check for approximately $1.4 million. In this way, there was evidence from which the jury could have found that DiGregorio knowingly entered into an agreement to withdraw the proceeds from a criminal offense, and so we will affirm the denial of his Rule 29 motion on Count Seven.

## D. Reasonableness of Sentence

DiGregorio appeals his sentence as unreasonable, arguing that the District Court, in its analysis of the 18 U.S.C. § 3553(a) sentencing factors, both did not adequately consider his limited role in the offense and overemphasized his obstruction of justice.

In reviewing a sentence for reasonableness, our inquiry proceeds in three stages. *See United States v. Cooper*, 437 F.3d 324 (3d Cir. 2006). We first look to whether the District Court correctly calculated the applicable advisory guidelines range. *Id.* at 330. Next, we determine whether the record shows the District

---

achievement of its ends." *United States v. Hsu*, 155 F.3d 189, 203 (3d Cir. 1998) (citation omitted).

Court gave "meaningful consideration to the § 3553(a) factors," which includes the consideration of "any sentencing grounds properly raised by the parties which have recognized legal merit and factual support in the record." *Id.* at 329, 332. Lastly, we evaluate whether the District Court reasonably applied the § 3553(a) factors to the particular circumstances of the case. *Id.* at 330. In this final step, our review is, to a great degree, deferential, because we recognize that "the trial court [is] in the best position to determine the appropriate sentence." *Id.*

DiGregorio does not challenge the calculation of his advisory guidelines range.[13] Instead, he argues that his 41-month sentence, 37 months below the bottom of the advisory guidelines range, is unreasonable. DiGregorio maintains that his role was essentially limited to introducing Nash to Rankin and that he received a relatively small payment for his role, most of which, he claims, was for wages owed.[14] He further claims that the District Court afforded his obstruction of justice undue consideration in fashioning a sentence; in this regard, DiGregorio seems to be arguing that because the advisory guidelines range took his obstruction of justice into account, the District Court was prohibited from further considering that conduct when fixing a sentence.

We find that DiGregorio's sentence was not unreasonable. The District Court heard DiGregorio's argument regarding his limited involvement, but reasonably rejected it. The Court noted that even though DiGregorio's financial gain from the plan was

---

[13]DiGregorio's base offense level of eight was increased: by 16 levels for an intended loss of $1,401,647.28 pursuant to U.S.S.G. § 2B1.1(b)(1)(I); by two levels for his conviction under 18 U.S.C. § 1956 pursuant to U.S.S.G. § 2S1.1(b)(2)(B); and by two levels for obstruction of justice pursuant to U.S.S.G. § 3C1.1. His total offense level of 28 combined with a Criminal History Category of I to yield an advisory guidelines range of 78 to 97 months' imprisonment.

[14]DiGregorio does not claim that he was entitled to a mitigating role adjustment pursuant to U.S.S.G. § 3B1.2.

25

relatively insubstantial, his role was nevertheless essential. DiGregorio was responsible for introducing Nash to Rankin; without him, this sub-scheme of the conspiracy would not have occurred. Furthermore, as the Court discussed, despite DiGregorio's limited financial gain, he set in motion a sub-scheme of the conspiracy which succeeded in withdrawing $ 1.24 million, an amount far larger than the loss or intended loss attributed to DiGregorio's co-conspirators here (*e.g.*, $253,000 for Greenidge and $138,000 for Pallitta). Moreover, despite DiGregorio's contention that his role here was minimal, the Court heard evidence that DiGregorio was the continuous liaison between Nash and Rankin and Elsis, and was present during discussions of the planned withdrawal, the splitting of the proceeds, and the possibility of another transaction. DiGregorio also helped formulate the cover story to explain to the company's investors the source of the cash infusion.

Contrary to DiGregorio's contention, the District Court did not overemphasize DiGregorio's obstruction of justice. We emphasize that a sentencing court is not prohibited from considering the factual basis underlying a defendant's sentence enhancements, and indeed, *should* consider those facts in order to tailor the sentence to the defendant's individual circumstances. Here, the Court, having heard evidence that DiGregorio both helped to invent a fictitious company in order to make the transaction appear legitimate, and then lied to the U.S. Attorney in a proffer session, determined that the "deliberate thought" behind DiGregorio's obstructive conduct set him apart from his co-defendants and warranted a more severe sentence. (DiGregorio App. 48.)

In imposing sentence, the District Court articulated the § 3553(a) factors and reasonably applied them to this case. The Court balanced the fact that DiGregorio had no criminal history with his conduct here, including his obstruction of justice. The Court also took into account the instruction to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), as reflected in the fact that DiGregorio, who had a higher offense level than his co-defendants because of the amount of loss and his obstruction of justice, received a longer sentence than they did.

Finally, the Court showed substantial leniency to DiGregorio by sentencing him to 37 months below the bottom of the advisory range, a sentence 47% less than the minimum advisory sentence. In light of this record, we cannot say the District Court imposed an unreasonable sentence here.

## III.

For the above reasons, we will affirm all appellants' convictions and DiGregorio's sentence.