NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2436
_____

UNITED STATES OF AMERICA

v.

DWAYNE K. ONQUE,
Appellant

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Crim. Action No. 1-10-cr-00510-011)
District Judge: Honorable Jerome B. Simandle
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
June 22, 2016
_____

No. 15-2453
_____

UNITED STATES OF AMERICA

v.

MASHON ONQUE,
Appellant

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Crim. Action No. 1-10-cr-00510-013)
District Judge: Honorable Jerome B. Simandle
_____

Argued June 21, 2016
_____

No. 15-2501
_____

UNITED STATES OF AMERICA

v.

NANCY E. WOLF-FELS,
Appellant

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Crim. Action No. 1-10-cr-00510-006)
District Judge: Honorable Jerome B. Simandle

_____

Argued June 21, 2016
_____

Before: FISHER, GREENAWAY, JR., and ROTH, *Circuit Judges*.

(Opinion Filed: November 9, 2016)

Peter A. Levin, Esq.
1927 Hamilton Street
Philadelphia, PA  19130

*Attorney for Appellant Dwayne Onque*

Anne C. Singer, Esq. [ARGUED]
34 Tanner Street
Haddonfield, NJ  08033

*Attorney for Appellant Mashon Onque*

2

Leigh M. Skipper, Chief Federal Defender
Brett G. Sweitzer, Assistant Federal Defender, Chief of Appeals
Keith M. Donoghue, Assistant Federal Defender [ARGUED]
Federal Community Defender Office for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA  19106

*Attorneys for Appellant Nancy Wolf-Fels*

Paul J. Fishman, United States Attorney [did not enter an appearance]
Mark E. Coyne, Assistant United States Attorney, Chief of the Appeals Division
Office of the United States Attorney
970 Broad Street, Room 700
Newark, NJ  07102

Glenn J. Moramarco, Assistant United States Attorney [ARGUED]
Office of the United States Attorney
Camden Federal Building & Courthouse
401 Market Street
Camden, NJ  08101

*Attorneys for Appellee*

_____

OPINION[*]
_____


GREENAWAY, JR., *Circuit Judge*.

After a consolidated trial, Appellants Dwayne Onque, Mashon Onque, and Nancy

Wolf-Fels were convicted of conspiracy to commit wire fraud; Dwayne Onque was also

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

convicted of conspiracy to commit money laundering. Before this Court, Appellants

allege a series of trial and sentencing errors, which we consider in turn. For the reasons

set forth below, we find no error. Accordingly, we will affirm the judgment of conviction

entered by the District Court.[1]

## I. Background

In 2006, four men—Nick Tarsia, Darryl Henry, Timothy Ricks, and Jerry Smith—

devised a mortgage fraud scheme seeking to obtain inflated mortgage loans. By

borrowing more funds than they paid for the properties and retaining the difference, the

conspirators were able to make money on each fraudulent transaction. The conspirators

entered into thirty-one real estate transactions from October 2006 through May 2008.

Ultimately, the conspiracy "caused approximately fifteen (15) million dollars in funds to

be released from various lenders, most often in the form of a wire." (JA 86.)

There were three tiers of conspirators. At the top (the "first tier") were the four

leaders—Tarsia, Henry, Ricks, and Smith—who planned, launched, and ran the

conspiracy. These leaders would find financially distressed property owners who would

agree to (A) sell their units at reduced prices to buyers provided by the conspiracy

leaders, and then (B) report a higher sale price for mortgage applications, with the

---

[1] *See Kapral v. United States*, 166 F.3d 565, 569 (3d Cir. 1999) ("In federal criminal practice, 'judgment of conviction' refers to a formal document, signed by the trial judge and entered by the clerk of the district court, that sets forth 'the plea, verdict or findings, the adjudication, and the sentence.'" (quoting Fed. R. Crim. P. 32(d)(1))).

4

understanding that the conspiracy leader would receive the difference between the inflated sale price and the actual sale price.

The second tier consisted of people who worked in the mortgage industry and who could prepare and authorize fraudulent "W-2s, income tax statements, bank statements, and also . . . 401(k) retirement fund[]" records to indicate that the purported purchasers of the properties were eligible for the requested loans. (JA 1860.) Nancy Wolf-Fels, a loan officer at Mortgage Now,[2] and Mashon Onque, a notary public and title officer at Tri-State Title Agency, Inc., were industry-insider conspirators who were part of the second tier.

At the lowest level of the conspiracy (the "third tier") were "straw purchasers" such as Dwayne Onque, who had good credit scores but lacked the funds to purchase properties. These straw purchasers agreed to apply for the inflated mortgages by signing fraudulent financial applications prepared by other conspirators. The applications contained false information about the straw purchasers' incomes, job titles, and assets. The documents also falsely indicated that the straw purchasers brought their own funds to closings. For their participation, the straw purchasers received "an up-front payment after the closing for allowing their names and credit information to be used in connection

---

[2] The Indictment indicates that Wolf-Fels was a mortgage broker, but she argues in her brief that, as indicated by the testimony of the manager of the Forked River branch of Mortgage Now at which Wolf-Fels worked, she was actually a loan officer. Because this is a distinction without a difference for purposes of this appeal, we need not resolve this non-substantive disparity.

5

with the transaction." (JA 88.)

The conspiracy leaders used the excess loan funds to pay the straw purchasers; they would also reinvest money in the scheme by setting some money aside to cover future down-payments and six months of mortgage payments for the purchased properties. These payments served to delay the discovery of the fraud and thus furthered the conspiracy. The leaders then split the remaining profits.

When the leaders failed to pay the mortgages and fees on certain properties, an investigation ensued that brought the conspiracy to light.

## II. Procedural History

On November 6, 2013, a federal grand jury returned a two-count Second Superseding Indictment against Wolf-Fels, the Onques, and four others. Count One of the indictment alleged that Wolf-Fels, Mashon Onque, and Dwayne Onque, and others participated in a conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 and contrary to 18 U.S.C. § 1343. Count Two alleged that Dwayne Onque and two others committed conspiracy to commit money laundering in violation of 18 U.S.C. § 1957.

After motions in limine, including the Government's request to introduce Rule 404(b) evidence against each defendant, trial commenced against Wolf-Fels, Dwayne Onque, and Mashon Onque.

At the close of a fourteen-day trial, the jury found all three defendants guilty as to Count One and found Dwayne Onque guilty as to Count Two. The District Court

6

sentenced Dwayne Onque to 63 months' imprisonment, Mashon Onque to 30 months'

imprisonment, and Wolf-Fels to 42 months' imprisonment. Each term of imprisonment

was to be followed by three years' supervised release.

The District Court considered and denied the defendants' various post-trial

motions. *United States v. Onque*, No. 10-510, 2015 WL 566987, at *1 (D.N.J. Feb. 9,

2015). Each defendant timely filed a notice of appeal.

### III. Analysis

The District Court had jurisdiction over this matter pursuant to 18 U.S.C. § 3231.

This Court has jurisdiction over the challenges to the convictions pursuant to 28 U.S.C.

§ 1291 and to the sentences pursuant to 18 U.S.C. § 3742(a). We consider, and reject,

each of Appellants' challenges.

### A. Challenge Raised by Wolf-Fels[3]

For the first time on appeal,[4] Wolf-Fels argues that the Government charged a

---

[3] In their appellate briefs, both Mashon Onque and Dwayne Onque joined this argument, which they, like Wolf-Fels, failed to raise below. This section of our analysis applies to the Onques as well as to Wolf-Fels.

At oral argument, the Government contended that, like a sufficiency of the evidence challenge, variance is not a type of argument that can be joined in such a manner, but rather must be argued by (1) making an individualized showing of prejudice; and (2) showing how this scheme was charged differently. Because we find that the Government proved the single conspiracy charged, we do not reach the issue of whether the variance argument is cognizable with respect to the Onques.

[4] When raised for the first time on appeal, variance claims are reviewed for plain error. *United States v. Vosburgh*, 602 F.3d 512, 531 (3d Cir. 2010).

single, large hub-and-spokes conspiracy in the indictment but proved, at most, that a number of smaller conspiracies took place.  In other words, Wolf-Fels argues that there was a variance between the offense charged and the evidence adduced at trial.  As a consequence, the Government introduced a great deal of evidence unrelated to Wolf-Fels.  Wolf-Fels further asserts that she was prejudiced by this purportedly extraneous evidence because it enabled the jury to "convict her based purely on association with a parade of guilty witnesses."  (Wolf-Fels Br. 33.)

At oral argument, Wolf-Fels stressed that the case had been tried as if it were sufficient to show that the four conspiracy leaders were involved in all charged activity, whereas the Government actually needed to show that the lower-tier conspirators were aware that other lower-tier conspirators were also participating in the conspiracy.  Mashon Onque agreed and contended that, in this case, multiple discrete conspiracies connected by only the participation of a few key participants had been charged as a "single, all-inclusive conspiracy."  *Blumenthal v. United States*, 332 U.S. 539, 547 (1947).  Onque also argued that such a variance can be prejudicial inasmuch as it enables the Government to introduce testimony by all alleged co-conspirators.

When the facts proven at trial differ from those alleged in an indictment, "an impermissible variance may exist."  *United States v. Perez*, 280 F.3d 318, 345–46 (3d Cir. 2002) (citing *United States v. Smith*, 789 F.2d 196, 200 (3d Cir. 1986)).  "A conviction must be vacated when (1) there is a variance between the indictment and the

8

proof presented at trial and (2) the variance prejudices a substantial right of the defendant." *United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007) (quoting *United States v. Kelly,* 892 F.2d 255, 258 (3d Cir. 1989)).

This Court uses "a three-step inquiry to determine whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies." *Kelly*, 892 F.2d at 258–59. We ask: (1) was there a common goal among conspirators; (2) was it in the nature of the scheme to agree to produce a continuous result requiring the conspirators' continuous cooperation; and (3) to what extent did the participants overlap in the various dealings of the conspiracy. *Id.* (citation omitted).

There can be no doubt that the Government established the existence of a single, large conspiracy in this case. First, the common goal was to obtain mortgage loans fraudulently for profit. Second, the continuous participation of three levels of conspirators was required to ensure both the success of each individual transaction and the conspiracy's ability to continue to reinvest funds in the acquisition of additional properties. Finally, each transaction involved at least one conspiracy leader, one straw purchaser, and one or more industry insiders, in satisfaction of the overlap requirement.

It is of no import that the industry insiders who worked on each transaction varied, nor that not every straw purchaser participated in each transaction. It is well settled that the "[G]overnment need not prove that each defendant knew all of the conspiracy's details, goals, or other participants." *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir.

9

1999).  Further, "the [G]overnment, without committing a variance between a single conspiracy charged in an indictment and its proof at trial, may establish the existence of a continuing core conspiracy which attracts different members at different times and which involves different sub-groups committing acts in furtherance of the overall plan." *United States v. Boyd*, 595 F.2d 120, 123 (3d Cir. 1978).

Here, the Government introduced evidence that Wolf-Fels worked with conspiracy leader Darryl Henry to arrange for the fraudulent sale of four properties to straw purchaser Larry Barker.  At oral argument, the Government stressed that, even though Wolf-Fels was directly linked to only three of the transactions,[5] the jury was entitled to infer—from Henry's testimony and from the overlap in information used in support of those transactions—that the four transactions, which all occurred during a period of six weeks, had to be coordinated.  The Government also introduced evidence that Wolf-Fels critiqued and offered to correct fraudulent documents prepared by Elizabeth Hidalgo, whom the conspiracy hired as a forger.

With respect to Mashon Onque, the Government furnished evidence that she had been recruited into the conspiracy by Ricks and may have known of Tarsia's involvement as well.  Mashon Onque served as the title agent for five fraudulent real estate

---

[5] Wolf-Fels served as the mortgage broker for two of those properties and she received a referral fee for outsourcing a third.

10

transactions[6] and notarized the documents used in two other transactions. The Government also showed that Mashon Onque deposited into her own account several checks made out to Dwayne Onque during the course of the conspiracy. Finally, the Government introduced evidence that Dwayne Onque earned over $75,000 by serving as the straw purchaser for five properties over the course of the conspiracy. Both Ricks and Tarsia were involved in at least four of those five transactions. Dwayne Onque completed forms indicating that he was purchasing these properties, he had brought the down payment to the closings, and his position and income were far higher than they actually were. In fact, Dwayne Onque brought no money to the closings, but was paid money for playing the role of purchaser in the sales, two of which involved the services of his sister, Mashon. To facilitate his role-playing, Dwayne Onque, at the suggestion of Ricks, asked his boss to lie about his position if anyone called to verify his employment.

In sum, the Government adduced evidenced that Wolf-Fels, Mashon Onque, and Dwayne Onque each participated in several, similar transactions. These transactions overlapped in purpose, in practice, and in participants with the other transactions discussed at trial. The transactions thus fell within a single, pyramidal conspiracy much like the check-cashing scheme this Court found to be one large conspiracy in *United States v. Greenidge*, 495 F.3d 85, 93–95 (3d Cir. 2007). The fact that the conspiracy encompassed transactions and additional participants beyond the ken of Appellants is of

---

[6] Mashon Onque's brother, Dwayne Onque, was the straw purchaser in two of these transactions, which took place less than two months apart.

11

no consequence given Appellants' sufficient connection to the pyramidal conspiracy.[7]

We therefore find no plain error in the form of variance.

**B. Challenges Raised by Mashon Onque**

In addition to the unavailing variance claim in which she joined, Mashon Onque raises six other challenges to her conviction. None is persuasive.

1. **Sufficiency of the Evidence Challenge**

"Sufficiency of the evidence is a question of law, subject to plenary review." *United States v. Moyer*, 674 F.3d 192, 206 (3d Cir. 2012). Our review is, nevertheless, deferential: this Court "review[s] the evidence in the light most favorable to the Government, afford[s] deference to a jury's findings, and draw[s] all reasonable inferences in favor of the jury verdict." *United States v. Fountain*, 792 F.3d 310, 314 (3d Cir. 2015) (quoting *Moyer*, 674 F.3d at 206)). Thus, "[w]e will overturn the verdict 'only

---

[7] At argument, Wolf-Fels attempted to distinguish the conspiracy at issue here from the pyramidal conspiracy in *Greenidge* on the basis that the larger *Greenidge* conspiracy could not have functioned without numerous coconspirators, such that the lowest-tier conspirators must have known that there were other members of the conspiracy. Wolf-Fels argued that, in this case, there would be no reason for lower-tier conspirators such as Wolf-Fels to suspect that other fraudulent transactions involving other industry insiders were taking place.

Wolf-Fels misconstrues *Greenidge* as requiring that coconspirators be able to readily deduce the participation of others at their tier of the conspiracy. It does not. Rather, *Greenidge* observed that the low-tier conspirators "were necessary to the overall success of the venture," and then contextualized that comment by explaining why many depositors were needed. *Greenidge*, 495 F.3d at 94. In short, *Greenidge* supports, rather than undercuts, the finding of no variance here.

when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt.'" *Id.* at 314–15 (quoting *Moyer*, 674 F.3d at 206).

Mashon Onque argues that there was not sufficient evidence to support her conviction. Not so. "To establish a charge of conspiracy, the Government must show (1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal, which [Appellant] knowingly joined." *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010) (citation omitted). As detailed *supra* in Section III.A., the Government adduced evidence sufficient to support the conclusion that the conspirators shared and collectively worked toward the purpose of profiting from a fraudulent mortgage scheme, as well as evidence—notably in the form of testimony by Ricks regarding his interactions with Mashon Onque and evidence that she signed patently false mortgage application documents—that Mashon Onque knowingly joined the conspiracy. Because there was evidence to support the jury's guilty verdict, we find no error in her conviction.

### 2. Rule 404(b) Evidence

Mashon Onque argues that the District Court erred in allowing the Government to introduce, pursuant to Rule 404(b) of the Federal Rules of Evidence, evidence of non-charged fraudulent property transactions in which she participated. We find no abuse of discretion in the District Court's determination to admit this evidence. *See United States*

13

*v. Lee*, 612 F.3d 170, 186 (3d Cir. 2010) (noting standard of review).

To determine whether evidence is properly admissible pursuant to Rule 404(b), this Court applies the test coined by the Supreme Court in *Huddleston v. United States*, 485 U.S. 681 (1988), which has four parts: "(1) the evidence must have a proper purpose; (2) it must be relevant; (3) its probative value must outweigh its potential for unfair prejudice; and (4) the court must charge the jury to consider the evidence only for the limited purposes for which it is admitted." *United States v. Givan*, 320 F.3d 452, 460 (3d Cir. 2003) (citations omitted). Proper purposes for admitting other-acts evidence include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).

In the three 404(b) transactions, which strongly resembled the charged transactions, Mashon Onque had served as a title agent; the fact that she participated in similar, fraudulent transactions five times, rather than just two, tends to indicate absence of mistake by "mak[ing] it more likely that [Mashon Onque] knew the business [s]he was about." *United States v. Claxton*, 685 F.3d 300, 310 (3d Cir. 2012). Further, after two of the 404(b) transactions, Mashon Onque deposited checks into her account, three of which were made out to her brother and one to Ricks. This evidence could thus tend to show a financial motive for Mashon Onque's participation in the conspiracy. Given these permissible uses that the 404(b) evidence could serve, we find the first *Huddlseton* factor

14

met.[8]

Because wire fraud is a specific intent crime, *United States v. Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004), it is also clear that the 404(b) evidence is relevant, which satisfies the second *Huddleston* factor.  The District Court weighed the prejudicial impact of the 404(b) evidence against its probative value and determined that, because the evidence was limited to three transactions and did not require any additional witnesses to testify, it was not unfairly prejudicial; this determination satisfies the third *Huddleston* factor.  Finally, in satisfaction of the fourth *Huddleston* factor, the District Court charged the jury in accordance with our model jury instruction for 404(b) evidence.  *Compare* JA 2262–63, *with* Third Circuit Model Criminal Jury Instructions § 4.29 (2014).  We therefore find no abuse of the District Court's discretion in its admission of this other acts evidence.

### 3. The Willful Blindness Instruction

"A willful blindness instruction is typically delivered in the context of explaining how the Government may sustain its burden to prove that a defendant acted knowingly in committing a charged offense."  *United States v. Tai*, 750 F.3d 309, 314 (3d Cir. 2014).  "[W]illful blindness is a 'subjective state of mind that is deemed to satisfy a scienter requirement of knowledge[.]'" *United States v. Stadtmauer*, 620 F.3d 238, 255 (3d Cir. 2010) (quoting *United States v. One 1973 Rolls Royce*, 43 F.3d 794, 808 (3d Cir.1994)).

---

[8] We thus reject Mashon Onque's assertion at oral argument that no permissible purposes were adduced to support the admission of this evidence.

Courts give a willful blindness instruction to ensure that "[d]eliberate ignorance cannot become a safe harbor for culpable conduct." *United States v. Wert-Ruiz*, 228 F.3d 250, 258 (3d Cir. 2000). To find willful blindness, a jury must find both that the defendant "subjectively believed that there was a high probability that [the fact or circumstance of which knowledge is required for the charged offense] existed" and that the defendant "consciously took deliberate actions to avoid learning," or "used deliberate efforts to avoid knowing" that that fact or circumstance existed. Third Circuit Model Criminal Jury Instructions § 5.06 (2015).

Mashon Onque argues that the District Court erred in giving the willful blindness instruction in this case because there was allegedly no evidence that Mashon Onque took steps to "avoid learning" of the fraudulent nature of the transactions in which she participated and because the instruction was thus confusing. This argument disregards the evidence that Mashon Onque served as the title agent and authorized fraudulent documents for two properties purchased by her brother—neither of which he could afford—less than two months apart. A jury could infer from Mashon Onque's failure to investigate these transactions, as well as her participation in other, similar transactions involving Ricks, that she suspected that the transactions were probably fraudulent and did not wish to have her suspicions confirmed through inquiry. This is sufficient to find willful blindness, which can be a "purely psychological avoidance, a cutting off of one's normal curiosity by an effort of will." *United States v. Carrillo*, 435 F.3d 767, 780 (7th

16

Cir. 2006) (quoting *United States v. Craig*, 178 F.3d 891, 896 (7th Cir. 1999)). We find

no abuse of discretion in the District Court's decision to give this jury instruction. *See*

*United States v. Hoffecker*, 530 F.3d 137, 167 (3d Cir. 2008) (noting standard of review).

### 4. Mashon Onque's Other Challenges

In addition to the claims set forth *supra*, Mashon Onque challenges the District

Court's admission of a summary chart, instruction that the jury could consider statements

by her co-conspirators, and determination that the Government's opening and closing

statements did not contain mischaracterizations that rose to the level of plain error. These

unavailing claims do not warrant lengthy discussion because they all depend on the

argument, rejected above, that the Government did not succeed in proving a single,

overarching conspiracy.

Mashon Onque alleges that one of the Government's exhibits was not a proper

summary exhibit under Rule 1006 of the Federal Rules of Evidence. That rule provides,

in relevant part, that "[t]he proponent may use a summary, chart, or calculation to prove

the content of voluminous writings, recordings, or photographs that cannot be

conveniently examined in court." Fed. R. Evid. 1006. Mashon Onque argues that the

exhibit should not have been allowed because the information it synthesized was not so

voluminous that the Court could not have conveniently examined it without summary.

She also contends that the exhibit created prejudice by suggesting that the checks

deposited into Mashon Onque's account, like the checks deposited by co-conspirators

17

that also appeared in the chart, were payment for her participation in the conspiracy.

Given the amount of evidence introduced by the Government, the use of multiple summary charts such as the chart of which Mashon Onque complains was entirely permissible. The fact that the chart included deposits that were conspiracy payments— and thus supported the inference that the deposits attributed to Mashon Onque were also payments—may create an inference that conflicts with Mashon Onque's version of events, but it does not in any way undermine the accuracy of the chart itself. We find no error in the admission of the chart.

Equally meritless is the claim that the District Court committed reversible error by instructing that the jurors could consider statements by co-conspirators whom Mashon Onque did not know. The District Court's instruction was virtually identical to this Court's model jury instruction 6.18.371K, which comports, in turn, with the Federal Rules of Evidence. See Fed. R. Evid. 801(d)(2)(E) (classifying as "not hearsay" a "statement offered against an opposing party" that "was made by the party's coconspirator during and in furtherance of the conspiracy"). Such statements by co-conspirators are "admissible against all" coconspirators, even when "made . . . prior to the adherence of some to the conspiracy." *United States v. Jannotti*, 729 F.2d 213, 221 (3d Cir. 1984) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 393 (1948)).

Finally, we adopt in full the District Court's thorough and cogent rejection of Mashon Onque's contention that the prosecutor prejudicially mischaracterized law and

18

fact in the Government's closing statements and rebuttal.  *See United States v. Onque*, ___ F. Supp. 3d ___, 2015 WL 566987, at *10–13 (D.N.J. Feb. 9, 2015) (addressing the prosecutor's remarks in detail); *see also United States v. Lee*, 612 F.3d 170, 194 (3d Cir. 2010) ("We have repeatedly held that a 'prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence.'"  (quoting *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991) (citations omitted))).

## C. Challenges Raised by Dwayne Onque

Appellant Dwayne Onque challenges both his conviction and his sentence. Because none of these challenges has merit, we will affirm his judgment of conviction.

### 1. Challenges that Overlap with Mashon Onque's Arguments

Like his sister, Dwayne Onque argues that the District Court erred in giving the jury a willful blindness instruction and in admitting fifteen exhibits, which he argues were not proper summary exhibits.  We find neither argument persuasive.

As to the willful blindness charge, Dwayne Onque argues that it improperly allowed the jury to find knowledge where, in fact, the evidence supported only the theory that he was negligent for signing documents that he had not read.  The Government's evidence that Dwayne Onque presented himself as the purchaser of multiple properties that he knew he could not afford, as well as his request that his employer confirm the false job information he supplied, suffice to support the willful blindness instruction.

19

Dwayne Onque argues that the District Court erred in permitting the Government to introduce certain summary charts because they did not summarize sufficiently voluminous evidence to be admissible pursuant to Rule 1006 of the Federal Rules of Evidence and because they were misleading and unfairly prejudicial by virtue of presenting only certain payments within each transaction represented. Further, the summary charts allegedly "allow[ed] the Government to repeat its entire case-in-chief shortly before jury deliberations." (D. Onque Br. 35 (quoting *United States v. Fullwood*, 342 F.3d 409, 413 (5th Cir. 2003)).)

As noted above, however, the Government introduced large amounts of evidence in this case. The fact that the charts included the most pertinent information with respect to each transaction does not render the charts misleading; on the contrary, it highlights their utility in winnowing out evidence extraneous to the charged offenses. The condensed charts certainly do not recreate the entirety of the Government's case. We again find no error in the admission of this summary evidence.

### 2. Sufficiency of the Evidence Challenges

Dwayne Onque asserts that the Government failed to carry its burden of proving that he had the necessary mental state—knowledge—to be convicted of either the wire-fraud or the money-laundering conspiracy.[9] In support of this contention, Dwayne Onque

---

[9] The money-laundering conspiracy charge stated that, in violation of 18 U.S.C. § 1957, Dwayne Onque knowingly conspired to engage in transactions of "criminally

points to the fact that he allegedly earned only $75,000 from properties whose mortgages totaled $1.6 million, as well as Ricks's testimony that Dwayne Onque "wasn't part of [Ricks], Darryl Henry and Nick Tarsia, no. He was just a buyer." (D. Onque Br. 24 (quoting J.A. 1339–40).)

We find that there is sufficient evidence, noted *supra* in Sections III.A. and III.C.1., to support Dwayne Onque's convictions. The fact that Dwayne Onque netted $75,000—only a fraction of the total mortgages for the transactions in which he participated—does not militate in favor of a different conclusion. *See Greenidge*, 495 F.3d at 103 (recognizing that, "even though [the defendant's] financial gain from the plan was relatively insubstantial, his role was nevertheless essential"). Similarly, the cited testimony is irrelevant inasmuch as "the [G]overnment did not have to prove that [Onque] participated in the conspiracy from its inception, but only that he knowingly became a member of the ongoing conspiracy." *United States v. Cont'l Grp., Inc.*, 603 F.2d 444, 452 (3d Cir. 1979).

### 3. Sentencing Challenges

Dwayne Onque challenges his sentence on the following grounds:[10] (1) the

---

derived property of a value greater than $10,000 that was derived from . . . conspiracy to commit wire fraud." (JA 97.) The same evidence thus supports both convictions.

[10] "We review the District Court's interpretation of the Sentencing Guidelines *de novo*, and scrutinize any findings of fact for clear error." *United States v. Cespedes*, 663 F.3d 685, 688 (3d Cir. 2011) (quoting *United States v. Aquino*, 555 F.3d 124, 127 (3d Cir. 2009)). "If we determine that the district court has committed no significant procedural error, we then review the substantive reasonableness of the sentence under an abuse-of-

District Court erred in applying the two-level sophisticated means enhancement; (2) the District Court erred in declining to apply the minor or minimal role adjustment; (3) the sentence was unreasonable because the District Court did not meaningfully consider the section 3553 factors or the asserted grounds for granting a downward variance.

Dwayne Onque first argues that the sophisticated means enhancement, U.S.S.G. § 2B1.1(b)(10), should not apply to him because he did not prepare any of the fraudulent forms that served as the basis for this enhancement. He bolsters his argument by noting that the Guidelines have since been amended to provide that the enhancement should apply only to defendants responsible for creating or using such documents. This argument lacks merit.

As the District Court found at Dwayne Onque's sentencing hearing, the Government introduced ample evidence that fraudulent forms were used in the conspiracy; that Dwayne Onque signed such forms and, through them, had mortgage funds wired into his account; and that he asked his employer to lie to corroborate the information presented in the forms. We find no clear error in the District Court's determination that the enhancement would apply to Dwayne Onque "both under [the then-]existing law and under the proposed amendment that [did not] take effect until

discretion standard, regardless of whether it falls within the Guidelines range." *United States v. Wise*, 515 F.3d 207, 218 (3d Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 50 (2007)).

November 1, 2015." (D. Onque Suppl. App. 48.)[11]

We similarly find no clear error in the District Court's determination that, under both the pre- and post-amendment Guidelines, Dwayne Onque was an "average" participant in the conspiracy, neither entitled to a downward variance for a minimum role nor subject to an enhancement for leadership. The evidence, detailed above, supports this conclusion, and Dwayne Onque's argument to the contrary is unavailing. We now turn to Dwayne Onque's final argument—that his sentence was substantively unreasonable because the District Court failed to meaningfully consider the factors set forth in 18 U.S.C. § 3553(a), which Appellant argues to suggest that a downward variance would have been warranted in his case. Dwayne Onque focuses, in particular, on the Court's "refus[al] to acknowledge Appellant[']s recognition of guilt" and failure to meaningfully consider "the need to deter the Appellant."

First, although Dwayne Onque stated, "I accept responsibility for what I've done," he also stressed that he had been deceived into participating in the fraud and "just did not know what [he] was doing." (D. Onque Suppl. App. 68.) Second, 18 U.S.C. § 3553(a)(2)(B) requires a sentencing court to consider what would constitute "adequate

_____

[11] Because we agree that the enhancement would apply under either the old or the new iteration of Section 2B1.1(b)(10), we do not reach the question of whether the 2015 amendment was a clarifying amendment that should apply retroactively. *See United States v. Diaz*, 245 F.3d 294, 301 (3d Cir. 2001) (discussing retroactive application or clarifying amendments).

23

deterrence," something the District Court did at length when it found that, although no specific deterrence was needed here, the need for general deterrence was great. Further, the District Court discussed Dwayne Onque's sentence, as compared to the sentences received by coconspirators, the scope and seriousness of the offenses of which he was convicted, and the amount of money involved in the scheme, which the Court adjusted for inflation. All in all, we find that the District Court did not abuse its discretion in sentencing Dwayne Onque to a 63-month term, which represents the bottom of the Guidelines range of 63–78 months.

## IV. Conclusion

Because we find none of the challenges raised by Appellants to be meritorious, we will affirm each of the judgments of conviction imposed by the District Court.